CARTER PRODUCTS, INC., Joseph G. Spitzer, and Marvin Small, Plaintiffs

v.

COLGATE-PALMOLIVE COMPANY, Defendant.

Civ. No. 6924.

United States District Court
D. Maryland.

Feb. 1, 1963.

Rehearing Denied March 5, 1963.

See also 4 Cir., 269 F.2d 299.

Piper & Marbury and John W. Avirett, II, Baltimore, Md., Morgan, Finnegan, Durham & Pine, Breed, Abbott & Morgan, William L. Hanaway, George B. Finnegan, Jr., Stoddard B. Colby, William D. Denson, Jerome G. Lee and Egon R. Gerard, New York City, for plaintiffs.

Venable, Baetjer & Howard and H. Vernon Eney, Baltimore, Md., Cahill, Gordon, Reindel & Ohl, Mathias F. Correa, Thomas C. Mason, and H. Richard Schumacher, New York City, and Wolfe, Hubbard, Voit & Osann and Richard R. Wolfe, Chicago, Ill., for defendant.

THOMSEN, Chief Judge.

We have now reached the final stage of this action for patent infringement and misappropriation of trade secrets brought by Carter Products, Inc., Joseph G. Spitzer and Marvin Small (plaintiffs) against Colgate-Palmolive Company (Colgate), namely, the determination and award of damages, profits, interest, fees and costs.

*History of the Proceedings*

In May 1955, pursuant to his opinion, 130 F.Supp. 557, Judge Coleman entered a decree in this case: he held that plaintiffs' patent (Spitzer et al., No. 2,655,480, issued October 13, 1953, for a pressurized shaving cream) was valid and had been infringed by defendant Colgate, and that Colgate had also misappropriated cer-

tain trade secrets of plaintiffs[1]; he ordered that an injunction issue restraining further infringement of the patent and use of the trade secrets, and requiring Colgate to assign to plaintiffs its rights under two patent applications; he referred the case to Robert W. Williams, Esq., as Special Master, to determine and report on the damages resulting from the infringement of the patent and the damages resulting from and the profits for which Colgate should be required to account because of the misappropriation of plaintiffs' trade secrets;[2] he reserved for future determination the question whether increased damages should be awarded; he found the case exceptional, held that plaintiffs are entitled to receive reasonable attorneys' fees to the date of the decree, as well as their costs and taxable disbursements and directed the Master to recommend the amount of such fees.

The decree, which had been stayed by supersedeas, was affirmed with one slight modification. Colgate-Palmolive Co. v. Carter Products, 4 Cir., 230 F.2d 855, March 1956, cert. den. 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59, October 1956.

On November 19, 1956, this court issued the injunction called for by Judge Coleman's decree, as so affirmed.[3] Thereafter, Colgate filed a motion in the Court of Appeals seeking to be relieved of its stipulation admitting infringement. That motion was denied, 4 Cir., 243 F.2d 163, April 1957. An effort by Colgate to have this court clarify and amplify the decree by changing the accounting period for damages and profits specified therein was likewise unavailing, 151 F.Supp. 427, May 1957.

In April 1957 plaintiffs moved for an order holding Colgate in contempt. On that motion this court found that Colgate had actively induced the sale by wholesalers and retailers of 1,600,000 cans of the adjudicated product in violation of the injunction, that any damages awarded for the sale of those cans should be trebled, and that plaintiffs were entitled to recover reasonable attorneys' fees for prosecuting that portion of their contempt motion.[4] But this court determined that an altered product which Colgate had begun selling in July 1956 did not infringe the patent nor violate plaintiffs' trade secrets covered by the injunction. 164 F.Supp. 503, July 1958. On Carter's appeal, the decision with respect to the altered product was affirmed, 269 F.2d 299, June 1959.

The proceedings before the Master had been suspended pending the decision of the contempt proceeding, except for the filing by Colgate of certain accounting data. Thereafter, the Master heard

---

1. The trade secrets which were misappropriated were set out in Paragraph 12 of the decree, which, as modified on appeal by eliminating item (b) thereof, read as follows:

 "(a) By combining the trade secret of the formula of the soap solution in the plaintiff's product 'Rise' with diluted Colgate lather cream to make 'Rapid-Shave No. 1'.

 "(c) By combining in a pressurized lather-generating composition a soap solution superfatted with petrolatum, carbowax, and excess stearic acid, and embodying said secret combination in its products 'Rapid Shave No. 2' and 'Instant Barber Shave.'

 "The above-described trade secret of sub-paragraph (c) was not disclosed or claimed in plaintiffs' United States Letters Patent No. 2,655,480, in suit."

 The two trade secrets will be referred to in this opinion as the 12(a) secret and 12(c) secret, respectively.

2. The decree specified certain accounting periods, which will be referred to at appropriate points in the body of this opinion.

3. All references to the decree herein will mean the decree as modified by the Court of Appeals.

4. Those fees have been determined and paid, and are not before the court at this time.

testimony, received exhibits, and after argument rendered a careful report [5], in which he recommended an award of $5,283,341, broken down as follows:

### The Master's Recommendations

| | | |
| ----- | --------------------------------------------------------- | ---------- |
| I. | Infringement Damages | $ 814,685 |
| II. | Misappropriation Damages under Par. 12(a) of the Decree | 271,718 |
| III. | Misappropriation Damages under Par. 12(c) of the Decree | 184,155 |
| IV. | Profits on General Sales | 2,760,902 |
| V. | Profits on Specialized Sales | 203,165 |
| VI. | Recommended Attorneys Fees to May 18, 1955 | 192,631 |
| VII. | To Treble Damages on 1.6 Million Cans | 82,800 |
| VIII. | Recommendation as to Exemplary Damages | 773,285 |
| | | $5,283,341 |

Both sides have excepted to most of the Master's recommendations. Before considering the individual items challenged by the respective parties, however, it will be helpful to review some basic legal principles which govern this phase of the case.

### Some Basic Legal Principles and Contentions of the Parties

Rule 53(e) (2), F.R.Civ.P., provides: "In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous."

██ This is a terse statement of a principle which has been applied by the federal courts for many years. In Tilghman v. Proctor, 125 U.S. 136, 149, 8 S.Ct. 894, 901, 31 L.Ed. 664, the Supreme Court said: "We are then brought to a consideration of the exceptions taken to the master's report in matters of fact, affecting the accuracy of his conclusions in respect to the amount of those profits, gains and savings. In dealing with these exceptions, the conclusions of the master, depending upon the weighing of conflicting testimony, have every reasonable presumption in their favor, and are not to be set aside or modified unless there clearly appears to have been error or mistake on his part." As recently as March 1962 the Fourth Circuit said: "We must give great deference to the judgment of the Master in such cases as this which turn in large part upon the credibility of witnesses and on involved questions of accountancy." London v. Troitino Bros., Inc., 301 F.2d 116, 118. See also Adamson v. Gilliland, 242 U.S. 350, 353, 37 S.Ct. 169, 61 L.Ed. 356; Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251, 263, 36 S.Ct. 269, 60 L.Ed. 629.

██ Since plaintiffs have not undertaken to prove damages based upon their own loss of sales as a result of Colgate's wrongful acts, damages for the misappropriation of the trade secrets as well as for the patent infringement may properly be allowed on the basis of a reasonable royalty.

██ Under the present patent statute, 35 U.S.C.A. § 284, plaintiffs are not entitled to an accounting for profits, in addition to damages, for the patent infringement.[6] However, under the case

---

5. Of 95 pages, containing 236 numbered paragraphs and supplemented by 21 pages of exhibits.

6. *The Statute.* The damages for patent infringement are controlled by 35 U.S. C.A. § 284, as amended in 1946, which provided:

"284. Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a

law they are entitled to an accounting for profits as well as damages for the misappropriation of their trade secrets. Accordingly, the decree awarded: damages and an accounting for profits for Colgate's wrongful use of the 12(a) secret in Rapid Shave No. 1; damages for the patent infringement involved in the manufacture and sale of Rapid Shave No. 2 and Instant Barber Shave, and damages and an accounting for profits for Colgate's wrongful use of the 12(c) secret in those two products.

The problem caused by the interrelation between a reasonable royalty for the use of the 12(a) secret and the profits for which Colgate might be accountable because of its use of that secret in Rapid Shave No. 1 was solved by the Master's treating the royalty as an added expense in determining profits. The similar problem with respect to Rapid Shave No. 2 and Instant Barber Shave is complicated by the additional element of a royalty for the patent infringement involved in the manufacture and sale of those two products after October 13, 1953, which must be considered along with the royalty for the use of the 12(c) secret therein from the time of their introduction, about July 1953, until they were superseded by the altered products in 1956. The Master treated both royalties as expenses in determining profits. Neither side disputes that principle, but—

Colgate contends: that the royalties recommended by the Master are too high; that the damages for patent infringement should not be doubled; that the facts proved do not justify an award of profits; that the profits were improperly computed by the Master; that the Master should have accepted Colgate's computa-

tion and should have limited any award of profits to those directly derived by Colgate from the use of the particular trade secrets in specific products; and that in any event the entire profits should not be awarded, but only a portion thereof.

On the other hand, plaintiffs contend: that the damages for patent infringement should be trebled rather than doubled; that the profits were even larger than those determined by the Master; and that the Master should have included in his recommended award, either as part of the profits or as a separate item, the value of the good will which Colgate built up for its pressurized shaving cream over the years by means of continued and repeated wrongful acts.

## FACTS

The evidence which was considered by the Master and which must be considered by the court at this stage of the case is to be found partly in the record of the original trial before Judge Coleman, partly in the record of the contempt proceedings, and partly in the record made during the hearings before the Master.

Many findings of fact were made by Judge Coleman at the conclusion of the original trial and by me at the conclusion of the contempt proceedings. Those facts were summarized in two opinions of this court, 130 F.Supp. 557 and 164 F.Supp. 503, and were adopted with very slight modifications in two opinions of the Fourth Circuit, 230 F.2d 855 and 269 F.2d 299. They need not be repeated here. The Master properly considered those findings to be binding upon him.

reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

"When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.

"The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances."

Before the amendment the statute permitted the recovery of profits as well as damages, and the cases construing the statute as it stood before 1946 may be important in considering the question of profits and damages in connection with the misappropriation of trade secrets in this case.

The evidence taken by the Master developed a great many additional facts relevant and material to the various issues on which he made recommendations. The Master included in his comprehensive report, under appropriate headings, findings with respect to the factual background and the several issues, in which he skillfully blended the material findings theretofore made by the courts with the findings which he himself made.

There is little dispute about the basic facts as found by the Master. This court accepts those findings, except as specifically noted in the discussion of the various issues below. A brief summary of the more important facts will suffice at this point.

\*

Before 1950 the market for shaving cream was relatively stable. In the late 1940's, however, Spitzer and Small invented the first successful pressurized shaving cream, for which the patent involved in this case ultimately issued, and entered into a royalty agreement with Carter, which spent over $250,000 in development costs, in the hope that the product would eventually take over more than half of the shaving cream market. Carter's product Rise appeared in April 1950, and was an immediate commercial success.[7]

Colgate, the leader in the shaving cream market, had repeatedly failed in its attempts to produce a marketable pressurized shaving cream. In September 1950 Colgate hired Fine, who had worked on the Rise formula while he was employed by Foster D. Snell, Inc. (Snell), a chemical engineering firm which had done much of the development work for plaintiffs. In October 1950, in violation of his agreement with Snell, Fine revealed to Colgate the formula for Rise and other secrets. These disclosures enabled Colgate to produce the first version of Palmolive Rapid Shave, which has been known in these proceedings as Rapid Shave No. 1. It utilized the 12(a) secret.

Colgate test-marketed Rapid Shave No. 1 in one city in July 1951 and in three cities in January 1952. It began to advertise and distribute Rapid Shave No. 1 nationally in October 1952. The sales increased rapidly and within eight months that product became the market leader.

Despite promises made to Snell, Colgate continued to use Fine's services in the development of its pressurized shaving cream business. In late 1952 and early 1953, after Fine had disclosed to Colgate the 12(c) secret, Colgate developed and in July 1953 began to market Rapid Shave No. 2, a superfatted product, which utilized the 12(c) secret and infringed plaintiffs' patent when it issued shortly thereafter. In April 1954 Colgate used the same formula in Instant Barber Shave.

In August 1951 and again in September 1953, Colgate caused to be filed in the name of Fine, alone or with others, applications for United States patents embodying plaintiffs' secrets which Fine had learned at Snell's and revealed to Colgate. An application was also filed in South Africa in January 1952.

On October 13, 1953, plaintiffs' patent, Spitzer et al. No. 2,655,480, was issued. Plaintiffs immediately instituted this suit for misappropriation of trade secrets and patent infringement. The trial before Judge Coleman began in November 1954; his opinion upholding the patent and finding Colgate guilty of misappropriation and infringement was filed in March 1955. The decree was entered, after long debate, in May 1955, was suspended pending appeal, and was affirmed with one slight modification in March 1956. Certiorari was denied in October 1956, and this court issued the injunction in November 1956. Both this court and the Fourth Circuit condemned the misconduct of Colgate and Fine.

7. Its sales in the first year were $400,000, and increased steadily to $2,600,000 in the first six months of 1953.

Shortly after the trial before Judge Coleman, i. e. in the spring of 1955, Colgate decided to alter the formula of its superfatted products to avoid both the patent and the trade secrets by substituting two aliphatic hydrocarbons for the Freon propellants, and by using a single superfatting agent, which was only mildly effective, in place of the three superfatting agents (excess stearic acid, petrolatum and carbowax), which constituted the 12(c) secret.[8] Colgate began to manufacture the altered products in May 1956, and by July 1956 they were on sale under the same names and the same dress as the adjudicated products, Palmolive Rapid Shave and Colgate Instant Barber Shave. Colgate gave no notice to the public in its advertising or otherwise that there had been any change in the composition of the products.

When the injunction issued in November 1956 some 1,600,000 cans of the adjudicated products were still in the hands of wholesalers and retailers. In violation of the injunction Colgate took no action to prevent the sale of the adjudicated products; rather, it induced their sale by its indiscriminate advertising as part of its continuing campaign to maintain the market leadership which it had seized by means of its repeated wrongful acts of misappropriation and infringement.

In the contempt proceedings, referred to in the opening paragraphs of this opinion, it was held: (a) that any damages ultimately awarded for the sale of the 1,600,000 cans should be trebled, and that attorneys' fees should be allowed plaintiffs for prosecuting that portion of their contempt motion; but (b) that the altered products which Colgate began selling in July 1956 did not infringe the patent nor violate plaintiffs' trade secrets covered by the injunction.

From the evidence which was presented to the Master, he made the following findings with respect to accounting periods and sales. Other findings and recommendations of the Master are set out or referred to in the discussion of the several points in dispute.

### The Accounting Periods Fixed by the Decree

Rapid Shave No. 1 was sold from July 1951 to July 1953.

Rapid Shave No. 2 was sold from July 1953 until after the injunction of November 20, 1956.

Instant Barber Shave was sold from April 1954 until after the injunction.

The accounting period for patent infringement damages (see par. 9 of the decree) begins October 13, 1953, the date of the patent, and ends with the last sale of any adjudicated product.

The accounting period for trade secret damages and profits (see par. 14 of the decree) begins with the first sale of an adjudicated product in 1951. It ends for Rapid Shave No. 1 (the 12(a) product) on October 13, 1953, when the patent issued and the formula for that product was made public. It ends for Rapid Shave No. 2 and Instant Barber Shave (the 12(c) products) with the last sale of such products.

### Colgate's General Sales of Adjudicated Products

| | Before Patent | After Patent | Total |
|---|---|---|---|
| Rapid Shave No. 1 .... | $2,716,013 | $ − | $ 2,716,013 |
| Rapid Shave No. 2 .... | 1,208,088 | 13,294,804 | 14,502,892 |
| Instant Barber Shave .. | − | 2,649,510 | 2,649,510 |
| Totals ............... | $3,924,101 | $15,944,314 | $19,868,415 |

8. The respective functions of the several agents were described by Fine in his patent application, and will be discussed below under the heading "The Nature of the 12(c) Secret".

In addition to the general sales of the adjudicated products, all of which were made in the United States, Colgate made various types of sales which they classified as "specialized sales". These included industrial sales, United States export sales from the United States factories, shipments to foreign subsidiaries and branches, goods manufactured abroad and freight claims sales. These specialized sales totaled between $1,000,000 and $1,500,000 for the period 1952–1956, inclusive, most of which was composed of foreign sales of Rapid Shave No. 2 and Instant Barber Shave during the years 1954–1956. The specialized sales were treated separately by the Master, and will be treated separately in the opinion, in a section of the Discussion headed "Specialized Sales".

## DISCUSSION

### Index

Page

A. Damages—Royalties ................................... 393
Patent Infringement (Item I of the Master's Recommendations), Misappropriation of 12(a) Secret (Item II), and of 12(c) Secret (Item III).

B. Profits .............................................. 394
(Items IV and V of the Master's Recommendations)

 1. All or Part ....................................... 394
 The Nature of the 12(a) Secret ...................... 395
 The Nature of the 12(c) Secret ...................... 395
 Law—Apportionment, Burden of Proof .............. 397
 Application of Law to Facts ......................... 398

 2. Computation of Profits ............................ 400
 (a) Overhead .................................... 403
 (b) Selling, Warehousing, Shipping and Administration Expenses ............................................ 403
 (c) Advertising .................................. 404
 (d) Research and Development Expense ............. 405
 (e) Income Tax .................................. 406
 (f) No Offset for Losses on One Product Against Profits on Another ................................. 406
 (g) Credit for Loss Periods—General Sales of Same Product ..................................... 406

 3. Good Will ....................................... 407

 4. Profits on General Sales .......................... 409
 (Item IV of the Master's Recommendations)

 5. Specialized Sales ................................ 411
 (Item V of the Master's Recommendations)

C. Increased Damages for Patent Infringement .............. 412
(Items VII and VIII of the Master's Recommendations)

D. Attorneys' Fees ....................................... 413
(Including the Attorneys' Fees Embraced in Item VI of the Master's Recommendations)

E. The Court's Awards ................................... 416

F. Interest .............................................. 416

G. Costs ................................................ 418

## A.

### DAMAGES—ROYALTIES

(Items I, II and III of the Master's Recommendations, set out above)

■ Plaintiffs have not attempted to prove their damages, either for the patent infringement or for the misappropriation of their trade secrets, upon the basis of their own loss of sales. Their damages for both wrongs may therefore be based upon royalties. When that measure is used, the court will ordinarily adopt an established royalty, if one is proved; otherwise the court will determine a reasonable royalty from all relevant circumstances. Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U.S. 641, 35 S.Ct. 221, 59 L.Ed. 398; Duplate Corp. v. Triplex Safety Glass Co., 298 U.S. 448, 56 S.Ct. 792, 80 L. Ed. 1274; Swan Carburetor Co. v. Nash Motors Co., 4 Cir., 133 F.2d 562, cert. den. 320 U.S. 762, 64 S.Ct. 36, 88 L.Ed. 454.

■ The royalty rates charged to other manufacturers by plaintiffs for the use of their patented invention after the patent had issued were proved. That evidence does not amount to proof of an established royalty, but was properly considered by the Master in determining the reasonable royalty rate which he recommended in connection with the patent infringement. No established royalty for either of the trade secrets was proved.[9]

The Master set out in his report the controlling legal principles, paragraphs 23–36, the circumstances existing at the various relevant times, paragraph 37A–Y, the opinions of the expert witnesses called by the respective parties, paragraphs 38–65, and the reasons for his conclusions, paragraphs 66–91. It is not necessary to repeat that material here. It is sufficient to say that the Master's findings of fact with respect to reasonable royalties are not clearly erroneous, that he applied proper legal principles, and that I agree with and accept his recommendations. The Master recommended:

1. A royalty of 10% of Colgate's net sales of Rapid Shave No. 1 for the use of the 12(a) secret therein—Item II of the Master's Recommendations, $271,718.

2. A royalty of 5% of Colgate's net sales of Rapid Shave No. 2 and Instant Barber Shave in the United States after the patent infringement, for patent infringement [10]—Item I of the Master's Recommendations, $814,685.

3. A separate royalty of 1% of all Colgate's net sales of Rapid Shave No. 2 and Instant Barber Shave, for the use of the 12(c) secret therein [11]—Item III

---

9. The Master properly concluded that the rate of reasonable royalty as the measure of damages for patent infringement should be determined in the light of circumstances existing at the time the patent issued, with the advantage of hindsight, as permitted by Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 53 S.Ct. 736, 77 L.Ed. 1449. The corresponding time for the fixing of reasonable royalties as the measure of damages for the misappropriation of trade secrets is when the several trade secrets were first misappropriated. See Chesapeake & O. Ry. Co. v. Kaltenbach, 4 Cir., 95 F.2d 801, 124 F.2d 375, 376; Saco-Lowell Shops v. Reynolds, 4 Cir., 141 F.2d 587.

10. These sales alone have the protection of the United States patent. Since this is the only amount awarded as damages for patent infringement, it is the only figure which can be considered in connection with Carter's claim that such damages should be trebled.

11. Despite plaintiffs' insistence on the importance of the 12(c) secret, with which this court agrees in part, plaintiffs have not excepted to the Master's recommendation of a 1% royalty for the use of the 12(c) secret, which is, of course, in addition to the 5% royalty allowed for the patent infringement involved in sales of Rapid Shave No. 2 and Instant Barber Shave after October 13, 1953. By adopting the Master's recommendation of a 1% royalty, I do not imply that the 12(c) secret contributed little to the commercial value of the products in which it was used. See discussion under the heading "The Nature of the 12(c) Secret" below.

of the Master's Recommendations, $184,-155.

## B.

### PROFITS

(Items IV and V of the Master's Recommendations)

Paragraph 14 of the decree awarded to plaintiffs, in addition to damages, any profits which Colgate has made by reason of its misappropriation of plaintiffs' trade secrets.

Three questions or groups of questions with respect to the accounting for profits must be decided:

1. Whether plaintiffs are entitled to recover all or only part of Colgate's profits from the sale of the adjudicated products.

2. Whether the court should accept the computation of Colgate's profits submitted by Colgate, and particularly Colgate's allocation of expenses to the adjudicated products; or should make the adjustments thereto recommended by the Master, which reduced the expenses allocated to the adjudicated products and increased the recoverable profits; or should make other adjustments greater or less than those recommended by the Master.

3. Whether plaintiffs are entitled to an allowance—as part of the profits or otherwise—for the momentum of good will which Colgate built up in the adjudicated products in violation of plaintiffs' rights, and which it was able to transfer in large measure to the altered products when they were introduced in the second half of 1956.

The following basic principle affects the decision of all three questions:

A misappropriation of trade secrets entitles the injured party not only to a reasonable royalty, but also to an award of profits on the basis of "unjust enrichment", because it is a "breach of confidence", a "species of fraud". Reynolds v. Whitin Machine Works, 4 Cir., 167 F.2d 78, at 86, 87. In effect, the courts treat the wrongdoer as a trustee who must be made to hand over the proceeds of his wrong. As Justice Holmes said in a case of unfair competition involving the improper use of a trademark: "To call the infringer an agent or trustee is not to state a fact but merely to indicate a mode of approach and an imperfect analogy by which the wrongdoer will be made to hand over the proceeds of his wrong." L. P. Larson, Jr., Co. v. William Wrigley, Jr., Co., 277 U.S. 97, 99, 48 S.Ct. 449, 72 L.Ed. 800. See also Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 405, 406, 60 S.Ct. 681, 84 L.Ed. 825, a plagiarism case. The trustee analogy has been applied in other trade-mark cases, and was applied in some but not all patent cases arising under the former statute. See Hamilton-Brown Shoe Co. v. Wolf Bros., 240 U.S. 251, 259–262, 36 S.Ct. 269, 60 L.Ed. 629; Westinghouse Electric & Mfg. Co. v. Wagner Electric & Mfg. Co., 225 U.S. 604, 32 S.Ct. 691, 56 L.Ed. 1222; Century Distilling Co. v. Continental Distilling Corp., 3 Cir., 205 F.2d 140, cert. den. 346 U.S. 900, 74 S.Ct. 226, 98 L.Ed. 400. The analogy appears to be regularly applied where the award of profits is based upon a misappropriation of trade secrets; no authority to the contrary has been found; and in any event, the principles enunciated by the Fourth Circuit in Reynolds control the accounting in this case.

### 1.

### *All or Part*

Are plaintiffs entitled to recover all or only part, and if the latter, what part, of Colgate's profits from the sale of the adjudicated products, by reason of Colgate's use of the 12(a) secret in Rapid Shave No. 1 and of the 12(c) secret in Rapid Shave No. 2 and Instant Barber Shave?

Initially, we must consider the extent to which the use of the trade secrets contributed to the commercial success of the several adjudicated products, the legal principles which govern the apportionment of profits, and the application of those principles to the facts.

*The Nature of the 12(a) Secret*

The 12(a) secret was described in the decree as follows:

"(a) By combining the trade secret of the formula of the soap solution in the plaintiffs' product 'RISE' with diluted Colgate lather cream to make 'RAPID-SHAVE NO. 1'."

The Master found that before Colgate misappropriated the 12(a) secret none of its laboratory products constituted a satisfactory commercial product, but that the use of the 12(a) secret enabled it to avoid the defects of its earlier laboratory products, and to produce Rapid Shave No. 1, which had immediate market acceptance; that the secret formula became an inherent, integral part of Rapid Shave No. 1, and was a fundamental element which permeated the product and made it saleable.[12] The Master concluded that the entire commercial value of Rapid Shave No. 1 can be attributed to the 12(a) trade secret formula incorporated therein, and that if Colgate had realized any net profits from the sale of Rapid Shave No. 1, plaintiffs would be entitled to recover all of them.

However, the Master found that Colgate realized no net profits from the sale of Rapid Shave No. 1 after restating Colgate's accounts: (a) to include in the expenses properly chargeable against the receipts from the sales of Rapid Shave No. 1, the 10% royalty which the Master recommended be allowed for the use of the 12(a) secret therein; and (b) to eliminate from those expenses the items which the Master concluded were not properly included therein. He therefore recommended no award of profits based upon the sales of Rapid Shave No. 1.

The conclusions which the court has reached with respect to the several items in dispute also result in a finding that Colgate realized no net profits from the sale of Rapid Shave No. 1.

*The Nature of the 12(c) Secret*

The 12(c) secret was used in the adjudicated products, Rapid Shave No. 2 and Instant Barber Shave, from the time those products were introduced until they were superseded by the altered product in the second half of 1956. Since those two products were identical, references to Rapid Shave No. 2 in this portion of the opinion will include Instant Barber Shave.

The nature of the 12(c) secret, as well as its importance, is disputed by the parties. The pertinent parts of paragraph 12 of the decree read as follows:

"That the defendant Colgate-Palmolive Company has wrongfully and unlawfully misappropriated trade secrets of plaintiff by embodying them in pressurized lather shaving compositions as follows:

" * * * * * *

"(c) By combining in a pressurized lather-generating composition a soap solution superfatted with petrolatum, carbowax and excess stearic acid, and embodying said secret combination in its products 'Rapid Shave No. 2' and 'Instant Barber Shave'."

Colgate contends that the 12(c) secret "consisted of the use of a combination of three well-known superfatting agents", whose only function was "to impart a smooth oiliness or emollient feeling to the shave similar to the effect produced by brushless shaving creams". The quoted words have been taken literally from this court's opinion, in 164 F.Supp. at 503, but out of context. The question *then* at issue was whether the use of any one of the three superfatting agents alone was a misappropriation of the secret. We are not concerned with that question *now*, because all three of the superfatting agents were used in Rapid Shave No. 2.[13] The question here is the extent to which the use of the three superfatting agents

12. These findings are strongly supported, inter alia, by the application for a patent which Colgate filed in Fine's name in August 1951.

13. All of the opinions of the Fourth Circuit and of this court show that the 12(c) secret involved a double combination; i. e. combining in a pressurized

contributed to the success of Rapid Shave No. 2.

Plaintiffs argue that because the combination referred to in paragraph 12(c) constitutes everything that came out of the can to produce the particular kind of shaving lather that Colgate wanted to sell and its customers wanted to buy, the conclusion must follow that all of the value of Rapid Shave No. 2 resulted directly from the effects produced by including the three specified superfatting agents in the combination. This contention goes too far, since it ignores Colgate's use in Rapid Shave No. 2 of a soap solution and a propellant neither of which was a secret when they were first used by Colgate, although both were covered by the patent which issued shortly thereafter.

However, as we shall see, the combination of the three superfatting agents had a broader function in Rapid Shave No. 2 and contributed more largely to its commercial success than Colgate is now willing to admit.

The Master found "that the use of the 12(c) secret added a valuable element to the product but was not an essential element to Colgate's pressurized shaving cream. The value of the 12(c) secret process was that by using the three secret agents with the other elements of a pressurized lather-generating soap solution, a commercially acceptable superfatted product resulted. It is true that Colgate later developed and marketed an alternative superfatting formula not within the 12(c) secret, and the possibility of doing so has bearing on the value of the secret and what would be a reasonable royalty. However, in 1951 Colgate misappropriated Carter's superfatting formula using the three secret agents, and in July 1953 began its very extensive use which was not discontinued until July 1956. This action of Colgate's indicates Colgate's 1953 judgment that the misappropriated formula was more desirable than any alternative." The Master further found that the use of the 12(c) secret ingredients in Rapid Shave No. 2 imparted a smooth oiliness or emollient feeling to the skin similar to the feeling produced by brushless shaving creams, a characteristic which Colgate's earlier products did not have; that this feature added to the commercial value of each of the products which embodied it, but did not create the entire value of the product.

Colgate argues that the emollient effect produced by the superfatting agents was their only function. Certainly that was an important function and contributed to the commercial success of the product. But it was not their only function, as appears clearly from the patent application filed by Colgate in the name of Fine in 1953, wherein it was stated that each of the three superfatting agents had specific effects in producing a superior pressure-propelled shaving cream. Excess stearic acid, one of the 12(c) ingredients, was said to aid in the stabilization of the emulsion and to exert a creaming effect. Carbowax, another ingredient, was said to aid in controlling the viscosity and stability of the composition, to exert added lubricating qualities, and to contribute to the formation of a finer bubble and better textured lather. Petrolatum, the third 12(c) ingredient, was said to increase the viscosity of the product, to aid in stabilizing the foam, and to permit easy gliding of the razor over the beard.[14]

It is true, as Colgate argues, that it is possible to produce and sell a commercially acceptable product without the superfatting feature, as witness Carter's Rise and Colgate's Rapid Shave No. 1.

lather-generating composition a soap solution superfatted with a combination of three specified superfatting agents, namely, petrolatum, carbowax and excess stearic acid.

14. Plaintiffs also argued that use of the 12(c) secret cured certain "seeds" which developed in Rapid Shave No. 1. The evidence showed that the seeds were caused by a potassium soap contained therein. The 12(c) secret did not cure this defect; the seed problem was avoided by using in Rapid Shave No. 2 a soap solution which did not contain any potassium soap.

Moreover, Colgate's altered product, which was introduced in July 1956, did not contain enough superfatting material to have any appreciable emollient effect. The single superfatting agent therein was included for a different purpose. See 164 F.Supp. at 523, bottom of second column. Colgate quotes plaintiffs' counsel as saying, "It doesn't make a difference between a good product and a bad one, it makes a difference between a good product and one that is different". That is true. But as the Master noted in the passage quoted above from his report, from July 1953 to the last half of 1956 Colgate deliberately chose to market products which used the 12(c) secret.

*Law—Apportionment, Burden of Proof*

██ Reynolds v. Whitin Machine Works, supra, 4 Cir., 167 F.2d at 86, 87, stated the basic principles which govern the award of profits in cases involving the misappropriation of trade secrets, but did not deal with the question whether plaintiffs are entitled to recover all or only part of the profits where some factor or factors other than the trade secret also play a part in the commercial success of the product. The parties have relied on precedents drawn from more or less analogous fields—patents before the 1946 amendment to what is now 35 U.S.C.A. § 284, trademarks and copyrights.

The leading case is Westinghouse Electric & Mfg. Co. v. Wagner Electric & Mfg. Co., 225 U.S. 604, 32 S.Ct. 691, 56 L.Ed. 1222, a patent case under the old law which allowed recovery of profits as well as damages. The Supreme Court laid down the following general principles: (1) that the burden is on the plaintiff patentee to prove profits; having done so, he is entitled to all the profits made from the sale of the infringing articles or devices, unless (2) the defendant infringer assumes the burden of showing that part of the profit is attributable to features other than those covered by the patent; (3) when such added features contributing to the profit are shown, it then devolves upon the patentee to prove either what part of the entire profit should be apportioned to the infringing device and what part to the added features, or to prove that the infringer, by commingling the elements, has rendered it impossible for the patentee to meet the requirement of apportionment; and (4) if the patentee introduces proper evidence to show such confusion, it then devolves upon the infringer to introduce evidence of a proper apportionment. See the summary of the Westinghouse rules in Levin Bros. v. Davis Mfg. Co., 8 Cir., 72 F.2d 163, at 164.

The reasons for the rules were discussed in Westinghouse, which the Supreme Court said "presented a case where the court was called on to determine the liability of a trustee ex maleficio, who had confused his own gains with those which belonged to the plaintiff. One party or the other must suffer. The inseparable profit must be given to the patentee or infringer. The loss had to fall on the innocent or the guilty. In such an alternative the law places the loss on the wrongdoer." 225 U.S. at 618, 619, 32 S.Ct. at 695, 696. The infringer in Westinghouse argued that the foregoing rule should not apply to patent cases, but the Court said that "the liability is not lessened because the confusion is due to a wrongful appropriation by a trustee *de son tort* instead of carelessness of a trustee lawfully appointed. Nor is it limited to those cases where the patented device is shown to have preponderated in the creation of the profits." 225 U.S. at 619, 620, 32 S.Ct. at 696. The Court went on to say: " * * * when a case of confusion does appear—when it is impossible to make a mathematical or approximate apportionment—then from the very necessity of the case one party or the other must secure the entire fund. It must be kept by the infringer, or it must be awarded, by law, to the patentee. On established principles of equity, and on the plainest principles of justice, the guilty trustee cannot take advantage of his own wrong. The fact that he may

lose something of his own is a misfortune which he has brought upon himself." 225 U.S. at 620, 32 S.Ct. at 696.

The Westinghouse case has been cited and followed many times. It is still the law, although in a number of patent cases under the old law and in one plagiarism case where it was impossible for either side to show the relative contributions of the several factors, the courts felt that under the particular circumstance of the case it would have been unfair to require the defendant to account for all the profits. Cf. Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251, 36 S.Ct. 269, 60 L.Ed. 629; Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U.S. 641, 35 S.Ct. 221, 59 L.Ed. 398; Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 106 F.2d 45, aff'd 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825; Swan Carburetor Co. v. Nash Motors Co., 4 Cir., 133 F.2d 562; Levin Bros. v. Davis Mfg. Co., 8 Cir., 72 F.2d 163; Dad's Root Beer Co. v. Doc's Beverages, S.D.N.Y., 94 F.Supp. 121, aff'd 2 Cir., 193 F.2d 77.

The Westinghouse rules are the general rules, to be applied unless their application would be unfair.

### Application of Law to Facts

The Master correctly found that the 12 (c) secret added to the commercial value of the products which embodied it, but did not create the entire value of those products; that the ingredients became integral parts of unitary products; that it is impossible to determine from the evidence what part of Colgate's profits from the sale of Rapid Shave No. 2 was attributable to the 12(c) secret; and that such impossibility arose because Colgate's books of account were not— and perhaps could not be—so kept as to reveal the part so attributable. Those findings were fully justified by the evidence. They indicate that plaintiffs have met the initial burden resting upon them

under the first Westinghouse rule, and that Colgate has gone forward and has shown that a part of the profit was due to features other than those covered by the trade secret, namely, to the TEA soap solution and the particular propellants used therein.[15] So, the next question is whether plaintiffs have met the new burden which devolved upon them under the third Westinghouse rule, to prove either what part of the entire profit should be apportioned to the trade secret and what part to the other features, or to prove that because of the commingling of the ingredients or confusion of the records it is impossible to make an apportionment. The Master found that plaintiffs had met their burden by proving the latter alternative. I agree. It is impossible to make such apportionment, not only because Colgate's books were not kept to show it, but also because, as the Master found, the superfatting ingredients called for by the 12(c) secret became an integral part of a unitary product and added commercial value to the product as a whole. In other words, Colgate so commingled the elements that it was impossible for plaintiffs to make an apportionment, and Colgate failed to meet the burden which then shifted to it under the fourth Westinghouse rule to introduce evidence of a proper apportionment.

From this failure on the part of Colgate, the Master concluded that plaintiffs are entitled to all of Colgate's profits from the sale of the products embodying the 12(c) secret. In reaching this conclusion, the Master followed strictly the fourth Westinghouse rule, as applied in the Westinghouse case for the reasons quoted above, and as applied in most of the other cases cited.

Colgate attacks the fairness of this conclusion, citing the discrepancy between the relatively small royalty recommended by the Master for the use of the 12(c) secret and his recommended al-

15. It should be noted that although neither the soaps nor the Freons used in those two products were trade secrets at the time Rapid Shave No. 2 was developed and introduced in July 1953, the Freons were covered by valid claims in the Spitzer patent, which issued on October 13, 1953.

lowance of all profits after crediting the royalty for patent infringement and the royalty for the use of the 12(c) secret. Colgate cites Sheldon v. Metro-Goldwyn Pictures, 2 Cir., 106 F.2d 45, aff'd 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825, a plagiarism case, and Swan Carburetor Co. v. Nash Motors Co., 4 Cir., 133 F.2d 562, cert. den. 320 U.S. 762, 64 S.Ct. 36, 88 L.Ed. 454, a patent case under the old law.

In the Swan case Judge Soper said: "But sometimes it is an impossible task to separate the profits due to the patent from the profits due to other causes and in such event it has been broadly stated in some of the decisons that, when the defendant is responsible for the blending of the lawful with the unlawful parts, he must abide by the consequences and account for the entire profits from the infringing sales. This phrasing of the rule, however, has been employed in cases where the infringer has added improvements or changes of his own to the patented structure and has so mingled his contribution with the original that any segregation of profits has become impossible. The burden of separating the profits at his peril, however, does not rest upon the defendant when he uses the patented structure without change as part only of a larger machine and there is no practicable way in which apportionment records may be kept." 133 F.2d at 566.

The controlling principles were stated by Chief Justice Hughes in the Sheldon case as follows: "To call the infringer a trustee *ex maleficio* merely indicates 'a mode of approach and an imperfect analogy by which the wrongdoer will be made to hand over the proceeds of his wrong.' [L. P.] Larson [Jr.] Co. v. [William] Wrigley [Jr.] Co., 277 U.S. 97, 99, 100 [48 S.Ct. 449, 72 L.Ed. 800]. He is in the position of one who has confused his own gains with those which belong to another. Westinghouse [Electric & Mfg.] Co. v. Wagner [Electric & Mfg.] Co., supra [225 U.S.], p. 618

[32 S.Ct. p. 695]. He 'must yield the gains begotten of his wrong.' Duplate Corp. v. Triplex [Safety Glass] Co., 298 U.S. 448, 457 [56 S.Ct. 792, 80 L.Ed. 1274]. Where there is a commingling of gains, he must abide the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him. When such an apportionment has been fairly made, the copyright proprietor receives all the profits which have been gained through the use of the infringing material and that is all that the statute authorizes and equity sanctions." 309 U.S. at 405, 406, 60 S.Ct. at 686, 687.

This is an equitable proceeding, and the weight of authority indicates that the strict rule of Westinghouse should not be applied arbitrarily. Whether an apportionment is to be made in this case should turn on an evaluation of all the facts in the light of the principles stated in *Westinghouse* and in *Reyonolds.*[16]

Against an allowance of all the profits from the sale of Rapid Shave No. 2 are:

The contributions made to the product by the soap solution and the propellants, which were not trade secrets, although they were covered by the patent; and the fact that the Master recommended a royalty of only 1% for the use of the 12 (c) secret.

In favor of an allowance of the entire profit from the sales of Rapid Shave No. 2 are:

The importance of the 12(c) secret, as shown by the claims made for it in the patent application filed by Fine on behalf of Colgate in September 1953; and Colgate's deliberate and continuing campaign of deceit, unfair competition and infringement, involving repeated misappropriation of plaintiffs' trade secrets, which amounted to a breach of confidence, a species of fraud, resulting in Colgate's unjust enrichment. Reynolds, supra, 167 F.2d at p. 87. Colgate was able to seize leadership in a new and profitable market through the sale, under the name "Palmolive Rapid

---

16. Reynolds v. Whitin Machine Works, 4 Cir., 167 F.2d 78, at 86–87.

Shave", first of Rapid Shave No. 1, which used the 12(a) secret, then of Rapid Shave No. 2, which used the 12(c) secret and infringed plaintiffs' patent, and finally of its altered product, which was sold under the same name without any indication to the public that the product had been altered, thus enabling Colgate to retain the leadership which it had wrongfully seized.

Particularly, it appears from the facts of this case that when a company enters the pressurized shaving soap field it must expect two or three loss years before its product reaches a profitable basis. Colgate's repeated wrongful acts resulted in little or no profit from its sales of Rapid Shave No. 1 during the two years it was sold, but very substantial profits from the sale of Rapid Shave No. 2. The good will which had been built up for those adjudicated products was carried over in large measure to the altered product, sold under the same name, so that Colgate was able to begin marketing that product at a profit without undergoing two or three preliminary loss years.

 In the light of the applicable legal principles, these factors lead the court to approve the Master's conclusion that there should be no apportionment of profits, but that all of Colgate's profits during the accounting period should be awarded to plaintiffs. The fairness of this result is supported by the conclusion of both the Master and the court that no separate award should be made for the good will value of the business in pressurized shaving cream which Colgate built up through the manufacture and sale of the adjudicated products. See 3, Good Will, below.

## 2.

### Computation of Profits

As required by the decree and by the Master, Colgate submitted schedules showing its proposed computation of the profit and loss on each product, year by year. In its calculations Colgate separated its general sales from its spe-

cialized sales. The specialized sales constituted only a small fraction of the total sales, and will be dealt with separately under the heading "Specialized Sales". What follows in this section of the opinion down to that heading deals with general sales of the adjudicated products.

Colgate's calculations, including its proposed apportionment of fixed overhead and other joint expenses between the adjudicated products and Colgate's other products, were made in accordance with generally accepted accounting principles for reporting facts to management. Colgate contended before the Master that those principles should control the computation of profits for which Colgate is liable in this case.

Plaintiffs attack the accounting method used by Colgate in preparing the schedules, on the ground that it does not fairly reflect all the profits realized by Colgate from its wrongful acts. They submitted to the Master a computation of profits based on the "differential accounting" or "direct costing" method. Plaintiffs do not dispute the amounts received by Colgate from the sale of the several products, nor the total amounts of the several expense items. The dispute is about the proper allocation of expenses in such a case as this.

The Master concluded "that the accounting in this case for profits for patent infringement and wrongful misappropriation should be [by] 'the differential accounting' or 'direct costing' method, wherein the cost of production includes no items which have not directly increased the seller's cost of production or sale." He accordingly made a number of adjustments to Colgate's figures. Some of the adjustments involved differential accounting; some involved the application of other principles. Specifically, he reduced the amounts allocated to the adjudicated products for overhead, advertising, selling, warehousing, shipping and administrative expense, and disallowed the claimed deduction for income taxes. Those adjustments will be discussed individually below, as well as the Masters' refusal to

reduce the amounts allocated for research and development expense.

In support of his conclusion that the differential accounting or direct costing method should be used, the Master relied on "the rationale set forth" in the following paragraph from the Restatement, Torts, sec. 748, comment i:

"i. Apportionment of Costs. If the defendant manufactures several kinds of products and is subject to liability to the plaintiff for conduct with reference to only one of them, there may be considerable difficulty in apportioning the defendant's costs between that product and the others. The apportionment made on the defendant's books is not necessarily determinative. Some expenses involve no problem of apportionment because they are incurred only in connection with one kind of goods. Such are, for example, the wages paid to employees working only on that kind of goods. The problem of apportionment arises only with reference to joint expenses, that is, expenses incurred in connection with several kinds of goods jointly. The typical example of such expenses is the overhead or general expense, including rent, heat, power, office expense and the like. Accountants may use one of several methods in apportioning such expenses, the choice depending largely on the needs or convenience of the particular business. But the apportionment in an accounting for profits under the rule stated in this Section is made on a special basis determined by the theory of the liability for profits. The purpose of the apportionment is not business convenience or business policy but an accounting by the wrongdoer for the total gains from his wrongdoing. Consequently the accounting for profits seeks to determine as accurately as possible what part of the joint expenses was incurred in the manufacture or marketing of the infringing goods and what part would have been incurred if the infringing goods had not been manufactured or marketed. If the manufacture and marketing of the infringing goods causes no increase in the general expense, no part of it is to be allocated to them, even though such a practice would be bad from the point of view of cost accounting or business policy. Only when the manufacture or marketing of the infringing goods increases the joint expenses is it proper to allocate a part of them to these goods. If the rule were otherwise, the defendant would be permitted to retain gains made by his own wrongdoing. The apportionment of joint expenses in the absence of such an increase would reduce the cost of the noninfringing goods and would thus permit gain for the defendant from his tortious conduct."

Colgate contends that the Master erred in adopting the method of allocation recommended by the Restatement, and that he should have accepted Colgate's computation. Although it admits that the court is not required to adopt the method which it used, Colgate argues that the court should adopt that method, and that the weight of authority does not permit the use of differential accounting.

The particular label attached to the method is relatively unimportant; we must consider whether the controlling authorities require, permit, or prohibit such adjustments to Colgate's allocations as were made by the Master.

The use of differential accounting was specifically approved in Century Distilling Co. v. Continental Distilling Corp., 3 Cir., 205 F.2d 140, 147, a trademark case, because "the use of the differential cost theory made possible the discovery of concealed or incidental profits—in the form of charges which but for the infringement would have been made against the non-infringing part of Century's business—properly allocable to" the infringing product. The Court found that the defendant's allocations had been either arbitrary or "matters of inter-

pretative accounting subject to the choice or whim of Century's accountants".

Differential accounting or some method similar thereto was applied in Levin Bros. v. Davis Mfg. Co., 8 Cir., 72 F.2d 163, and in Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 106 F.2d 45, aff'd 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825, where the Second Circuit said that Levin Bros. stated the correct rule on this point.

Defendant relies particularly on the Tremolo case, Tremaine v. Hitchcock & Co., 23 Wall. 518, 90 U.S. 518, 23 L.Ed. 97, a patent case involving an optional addition to organs, in which the Court approved apportionment to the infringing device of all defendant's general expenses, even though some of them were not increased by the sale of the infringing device. The Tremolo case has been seldom cited by federal courts, and is hard to reconcile with some later Supreme Court decisions, e. g., Sheldon v. Metro-Goldwyn Pictures Corp., supra. In Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251, 36 S.Ct. 269, 60 L.Ed. 629, the defendant contended that the account, as stated by the Master and confirmed by the Circuit Court of Appeals failed to make due allowance for certain items entering into the cost of manufacturing and selling the shoes in diminution of defendant's profits, including interest on capital, depreciation of real estate, taxes, insurance, advertising, and trade discounts. But the Supreme Court affirmed, saying: "These are matters of fact, respecting which we see no sufficient reason for disturbing the decree." 240 U.S. at 262, 36 S.Ct. at 273.

"Reasonable and necessary" expenses were allowed in Sutton v. Gulf Smokeless Coal Co., 4 Cir., 77 F.2d 439, a patent case. See also Duro Co. of Ohio v. Duro Co. of New Jersey, 3 Cir., 56 F.2d 313, a trademark case, and Alfred Bell & Co. v. Catalda Fine Arts, S.D.N.Y., 86 F. Supp. 399, a copyright case. None of those cases involved a misappropriation of trade secrets or any other species of fraud,[17] or anything comparable to the situation shown by the record in this case.

The Tremolo case was discussed at length in two Massachusetts cases, Regis v. H. A. Jaynes & Co., 191 Mass. 245, 77 N.E. 774, and C. A. Briggs Co. v. National Wafer Co., 215 Mass. 100, 102 N.E. 87, which indicate that the Tremolo rule should be applied unless special circumstances would make its application unjust.

In the case at bar there are several circumstances which would make application of the Tremolo rule unjust.

Colgate's wrongful acts in the manufacture and sale of the adjudicated products included not only patent infringement, carried to the point of contempt of this court's injunction, but also repeated and continuous misappropriation of trade secrets, and deceit in connection therewith. These acts enabled Colgate to become the leading manufacture of pressurized shaving creams and to build up a momentum of good will for the adjudicated products which it was able to transfer in large measure to the altered products by so packaging and advertising those products that the public was not told there had been any change. They enabled Colgate to begin marketing its altered products at a sales level which could not otherwise have been attained for several years, and to avoid some of the costs of introducing a new product.

Plaintiffs contend that they are entitled to recover the value of this momentum of good will, either as part of the profits for which Colgate is required to account, or as a separate item. For reasons which will be stated below under the heading "Good Will", the court has concluded that plaintiffs are not entitled to such an allowance; but the facts set out in the preceding paragraph should be considered in deciding how the various expense items for which Colgate claims credit should be apportioned.

 Colgate's repeated misappropriation of plaintiffs' trade secrets resulted

---

17. It should be noted, however, that the Century Distilling case stated that fraud is not a prerequisite to the use of differential accounting.

in Colgate's unjust enrichment, for which it is being made to account. The purpose of the apportionments with which we are concerned in this case is not to serve business convenience or business policy, but to secure a proper accounting by a wrongdoer for the total gains of his wrongdoing. What may be a proper method of apportioning expenses in reporting results to management may not be—and in this case is not—a proper method to be used in accounting for profits derived as a result of the misappropriation of trade secrets.

It follows that each of the contested items should be considered separately, in the light of all the facts affecting the particular item, and of the principles set out in the Restatement, Torts, sec. 748, comment i, quoted above.

### (a) Overhead

Colgate charged $785,216 against its general sales of adjudicated products as a deduction for "fixed overhead". The Master found that the entire $785,216 of overhead expenses charged by Colgate were necessary expenses for the manufacture of the adjudicated products; but that one-half of that sum—$392,608— represented fixed or non-variable overhead costs which did not vary with the volume of production or sales of adjudicated products, and would have been incurred in connection with the operation of Colgate's factories in which the adjudicated products were produced along with other Colgate products whether or not Colgate had manufactured the adjudicated products. He, therefore, concluded that the cost of sales of the adjudicated products, as shown on Colgate's relevant exhibits, should be reduced by $392,608.

In this recommendation the Master is supported by the able opinion of Judge Stone in Levin Bros. v. Davis Mfg. Co., 8 Cir., 72 F.2d 163, at 165, 166, which was adopted in principle by Judge Learned Hand in Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 106 F.2d 45, 54, aff'd 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825. Judge Lowell followed the same principles in Krentler-Arnold Hinge

Last Co. v. Leman, D.Mass., 24 F.2d 423, 424. See also Restatement, Torts, sec. 748, comment i. Cf. Victory Fireworks & Specialty Co. v. Commercial Novelty Co., D.Md., 26 F.Supp. 126. The Master's recommendation is supported by the weight of authority and should be adopted in this case.

### (b) Selling, Warehousing, Shipping and Administration Expenses

For the same reasons that he recommended reduction in Colgate's allocation of overhead expenses to the adjudicated products, the Master recommended a reduction of $407,766 to eliminate fixed and nonvariable expenses of selling; a reduction of $247,843 to eliminate fixed and nonvariable expenses of warehousing and shipping; and a reduction of $468,326 to eliminate fixed and nonvariable expenses of administration. Each such reduction was of a part only of the particular category of expense, and was determined according to the uncontradicted testimony of plaintiffs' accounting expert, Simone. Colgate's comptroller, Bennett, testified that such fixed costs were "substantial", but that Colgate kept no records showing the amounts of such fixed costs or the amounts of such variable costs. As heretofore noted, the court must accept the Master's findings of fact unless they are clearly erroneous. Rule 53(e) (2), F.R.Civ.P., and cases cited above. The court finds that they are not clearly erroneous; on the contrary they appear to be supported by the weight of the evidence.

What Colgate calls the "rewriting" of its books has been made necessary by Colgate's failure to keep its books so as to maintain "separate and accurate records of all its infringing acts; * * * on its failure to keep such records, the court, in measuring the damages on account of his trespasses, should resolve all doubts against him". Computing Scale Co. v. Toledo Computing Scale Co., 7 Cir., 279 F. 648, 673. See also the cases cited under "Overhead" above, and the principles set out in the Restatement, Torts, sec. 748, comment i, quoted above. Colgate has shown no sufficient reason

why the court should not follow the Master's recommendation.

### (c) Advertising

Colgate claimed before the Master and still claims expense deductions totaling $6,513,651 for advertising the adjudicated products during the accounting period from 1952 to July 1956. Carter claimed before the Master that this deduction should be reduced by $2,977,505, in part ($1,923,189) to reflect an allocation "on the basis of the ratio of total company advertising to total company sales", and in part ($1,054,316) to reflect "investment advertising spending".

Colgate's advertising, like all similar advertising, seeks several objectives: immediate sales of the particular products advertised; future sales of the particular products advertised; and increased future sales of other products by promoting the corporate name or other trade name by which the company's products are generally known.

The allocation of all advertising expense on the basis of "the ratio of total company advertising to total company sales" would recognize the general benefit which inured to Colgate from the advertising of the adjudicated products, but the Master found that there was no satisfactory evidence to fix the value of any such benefit. He further found that the proposed capitalization and subsequent amortization of each year's advertising expense, to reflect "investment advertising spending", was too speculative. He therefore refused to recommend the reductions requested by plaintiffs.

The Master recognized, however, that there was merit in plaintiffs' contention that some of the advertising expense charged against the adjudicated products during the accounting period benefited not only Colgate's other products generally, but specifically benefited the altered product when it was introduced in July 1956, and that such anticipated benefit to the altered product was a principal reason for much of the advertising in 1955 and 1956.

In the contempt proceeding, 164 F. Supp. at 509, this court found that shortly after the trial before Judge Coleman, Colgate decided to alter the formula of the adjudicated products and to substitute hydrocarbons for the Freon propellants in order to be able to market a product which did not infringe the patent or misappropriate the trade secrets. The Master found that Colgate's first research in this direction began about March 15, 1955, a few days after the filing of Judge Coleman's opinion, 130 F.Supp. 557, and that consumer tests were held in May 1955, which were reported favorable in July 1955. When the altered products came on the market shortly before July 1956, they were given the same name and the same appearance as the adjudicated products which they replaced. No notice to the public of any change was given, nor was any change made in the advertising, which continued to promote "Palmolive Rapid Shave" and "Colgate Instant Barber Shave". Thus, as this court noted, 164 F.Supp. at 509, the altered products were launched with the momentum of good will which Colgate had built up for its adjudicated products in violation of plaintiffs' rights.

The Master found that by July 1955 Colgate had determined the feasibility of continuing its pressurized shaving cream business with non-infringing hydrocarbon products, and that the advertising of Rapid Shave and Instant Barber Shave from July 1, 1955, until the end of the accounting period (all of which Colgate charged against the adjudicated products) benefited the altered products when they came on the market in May 1956 as much as it benefited the adjudicated products, which were marketed until July 1956. The Master concluded that the amounts charged against the adjudicated products by Colgate for advertising in the second half of 1955 and in 1956 should be divided in half, to reflect the portion of the advertising expense which was made for the benefit of the altered products soon to be offered to the public under the same name and dress as the adjudicated products.

Accordingly, the Master recommended that the following reductions should be made from the expense charged against the adjudicated products by Colgate for advertising in 1955 and 1956:

½ of advertising of adjudicated products in the last half of 1955, or ¼ of total advertising for 1955 ......$ 582,016

½ of advertising of adjudicated products for 1956 ...... 530,040

Total to be deducted ........$1,112,056

The circumstances relied on by the Master fully justify a 50% reduction in the advertising expense charged against the adjudicated products after July 1, 1955, especially since Colgate built up for its altered products a substantial momentum of good will to which not only its advertising but also its repeated wrongful acts in connection with the manufacture and sale of the adjudicated products contributed substantially. For reasons stated below, no separate allowance is being made for this good will, but in order to give proper recognition to the facts recited above, the court should reduce the advertising expenses charged against the adjudicated products after July 1, 1955.

However, the Master made an error in computing the figure for 1955. He correctly found that the total amount charged against the adjudicated products for 1955 advertising was $2,328,064, but he erred in estimating and finding that one-half of that amount, or $1,164,032, was spent in the second half of the year. The record shows that the amount spent in the last half of 1955 was $958,690, of which one-half is $479,345. The latter figure should be used instead of $582,016, with the result that the total to be deducted from advertising expense will be $1,009,385, rather than $1,112,056.

*(d) Research and Development Expense*

Colgate charged against the adjudicated products for research and development expense a total of $196,744 for the years 1952–54 and a total of $184,383 for the years 1955–56. Those amounts were calculated in accordance with Colgate's established practice of distributing its entire annual research and development expense among all the products sold by it during the year in proportion to their respective sales volume during the year. This is ordinarily a reasonable method of allocation, because some research and development expense is unproductive and not chargeable directly to any product which will ever be sold. The Master found that the method used was in accordance with conventional accounting procedures. Plaintiffs do not deny that its use in this case is proper provided research and development work was in fact done on the adjudicated products during the particular years in question.

The Master found that research and development work was done in connection with the adjudicated products during the years 1952–54, and plaintiffs do not dispute that finding.

With respect to the years 1955–56 the Master found, after a careful analysis of the evidence, that plaintiffs had failed to prove that no research was done on the adjudicated products in those years. Plaintiffs take the position that since the evidence shows that within a few months after the trial before Judge Coleman in January 1955, Colgate decided to substitute the altered products for the adjudicated products, it is incredible that much if any research or development work was done on the adjudicated products thereafter; and that the burden was on Colgate to show that any such work was done, and Colgate failed to meet that burden. " 'All evidence is to be weighed according to the proof which it was in the power of one side to have produced and in the power of the other side to have contradicted.' " Blatch v. Archer, Cowp. 63–65, per Lord Mansfield, quoted in Gotham Silk Hosiery Co. v. Artcraft Silk Hosiery Mills, 3 Cir., 147 F.2d 209, 214. There is merit in plaintiffs' contention. Without question, most if not all of the research and development work which Colgate did on pressurized shaving cream in 1955–56

was done in connection with the development of the altered products. The same reasons which justify the recommended reduction in the advertising expense require a corresponding reduction in the charge against the adjudicated products for research and development expense during the years 1955–56. The total charge made by Colgate for those years is $184,383. In view of the facts, a reduction of $92,191 is required and will be made.

### (e) Income Tax

█ Colgate charged against the profit from the sale of Rapid Shave No. 2 federal income taxes for 1954, 1955 and 1956 in the total amount of $856,553.[18] The Master disallowed the charge, on the authority of L. P. Larson, Jr., Co. v. William Wrigley, Jr., Co., 277 U.S. 97, 48 S.Ct. 449, 72 L.Ed. 800, Alfred Bell & Co. v. Catalda Fine Arts, 2 Cir., 191 F.2d 99, Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 106 F.2d 45, aff'd 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. and Goodyear Tire & Rubber Co. v. Overman Cushion Tire Co., 6 Cir., 95 F.2d 978.

Those authorities have established the rule that no deduction should be allowed for income taxes paid by a defendant where his infringement was conscious and deliberate, or in bad faith, though a deduction might be allowed to an innocent infringer. There are strong arguments in favor of denying the allowance even to an innocent infringer, since plaintiffs will be required to pay income taxes on any amount recovered and should not have that amount diminished by a prior charge for income taxes, whether or not defendant may be entitled to credit against its taxable income the profits which will be accounted for and paid. But assuming the good faith test is applicable, Colgate must be denied the claimed deduction because, as the Master found, the patent infringement was conscious and deliberate, and the misappropriation of plaintiffs' trade secrets by

Colgate before the patent issued was wrongful, amounting to a breach of confidence, a species of fraud. See Reynolds v. Whitin Machine Works, 4 Cir., 167 F.2d at 86, 87.

### (f) No Offset for Losses on One Product Against Profits on Another

█ In connection with the computation of profits on general sales the question arose whether losses sustained on the sale of Rapid Shave No. 1 should be offset against profits made on the sale of Rapid Shave No. 2. The Master found that there should be no offset, and Colgate does not contest this finding. The Master was clearly correct in treating the general sales of each product separately. His action is supported by the Restatement, Torts, sec. 747, comment d, and by the principles stated in Duplate Corp. v. Triplex Safety Glass Co., 298 U.S. 448, 56 S.Ct. 792, 80 L.Ed. 1274. See also Adolph Gottscho, Inc. v. American Marking Corp., 26 N.J. 229, 139 A.2d 281, 67 A.L.R.2d 816, and cases cited therein.

### (g) Credit for Loss Periods—General Sales of Same Product

The question of setting off loss years against profit years of the same product is presented only in connection with the general sales of Instant Barber Shave and in connection with "specialized sales",[19] since the general sales of Rapid Shave No. 1, even after the reduction in expenses recommended by the Master, resulted in a loss every year it was sold, whereas the general sales of Rapid Shave No. 2 resulted in profit every year.

Instant Barber Shave was sold only in 1954–56. When the adjustments made by the Master to Colgate's expenses are given effect, it appears that a small profit before royalties was made from the sale of Instant Barber Shave in 1954, that a loss was incurred in 1955 and that there was a substantial profit in 1956. The Master lumped together the sales and

---

18. Earlier years of Rapid Shave sales produced no profits.

19. The problem in connection with "specialized sales" will be discussed under that heading below.

expenses as adjusted for all three years, and found that the net profit for the three years before royalties was $38,-949, but that there was a net loss of $120,021 for the three years after royalties in the amount of $158,970, which he had recommended be awarded to plaintiffs, were taken as an additional expense. He therefore recommended that no allowance for profits be made on the general sales of Instant Barber Shave. If the years had been treated separately (including a separate annual calculation of royalties) there would have been losses in 1954 and 1955, but a profit in 1956.

▆▆▆ Plaintiffs contend that the Master's treatment of the general sales of Instant Barber Shave as a single unit is inconsistent with his separate annual calculation of profits on Rapid Shave No. 2. There is no such inconsistency because the separate calculations with respect to Rapid Shave No. 2 showed a profit each year, and the question of possible credit for loss years did not arise. Whether loss periods should be offset or ignored depends upon the particular circumstances. The general rule that a plaintiff in an accounting for profits may pick and choose among accounting periods, and select those which are profitable, is subject to an important limitation: he may do so only if the periods or transactions with respect to a particular product are independent of each other. See Restatement, Torts, sec. 747, comment d, and MacBeth Evans Glass Co. v. L. E. Smith Glass Co., W.D. Pa., 21 F.2d 553, 555, modified in part on other grounds, 3 Cir., 23 F.2d 459. That is a debatable question with respect to the sales of Instant Barber Shave; the heavy advertising expenses in 1955 were undoubtedly responsible in large part for the profit in 1956. All facts considered, the court finds that the Master was not clearly wrong in finding that the three years of Instant Barber Shave were not independent of each other, and in treating the general sales of Instant Barber Shave as a single unit.

### 3.

#### Good Will

In the contempt proceedings, 164 F. Supp. at 509, this court referred to "the momentum of good will which Colgate had built up for its adjudicated products in violation of plaintiffs' rights". The evidence now shows that this momentum of good will was carried over in large measure to the altered products, because Colgate advertised and marketed the altered products without telling the public that there had been any change in the composition of Palmolive Rapid Shave or Colgate Instant Barber Shave.

Plaintiffs made repeated efforts before the Master to find some basis for obtaining an award which would include an allowance for this good will. The shifting positions taken by plaintiffs and Colgate's answers thereto are discussed at length in the Master's report, paragraphs 194 et seq. Plaintiffs' final effort before the Master, repeated before the court, was an effort to secure an award of $7,-500,000 for the good will or going concern value of Colgate's pressurized shaving cream business in 1956, just before the altered products were introduced. They seek this award either as part of the profits for which Colgate must account, or as an independent item to which they are entitled under the decree.

Plaintiffs cite Webster's New International Dictionary, 2nd ed., which shows that the word "profit" formerly had a broad meaning, including "advantage; benefit", but now has the following relevant meaning: "3. The excess of returns over expenditure in a given transaction or series of transactions." [20]

20. In 3c of this definition "advantages" are referred to but it is clear that the advantage mentioned has reference to advantages derived by use of one method over another, and not to an "advantage" in the nature of good will. Similarly a note following definitions 3 and 4 states: "The word *profit* . . . includes any benefit or advantage accruing from the management, use, or sale of property or from the carrying on of any process of production or from the conduct of busi-

Plaintiffs argue that they are not limited by the decree to an accounting for profits, but are entitled to all profits, gains and advantages derived by Colgate from its repeated wrongful acts. They cite Illinois Central R. R. Co. v. Turrill, et al., 94 U.S. 695, 24 L.Ed. 238, Tilghman v. Proctor, 125 U.S. 136, 8 S.Ct. 894, 31 L.Ed. 664, and Levin Bros. v. Davis Mfg. Co., 8 Cir., 72 F.2d 163. Levin Bros. does give the term "profits" a broad definition, including "advantages", but the latter word is used in a different sense from the use proposed here. There is language in Tilghman which appears to support a broad definition of "profits", but there is language in Illinois Central which indicates that "advantages" embrace items not involved in "profits".

Many authorities hold that words used in a decree should be interpreted in the light of the court's opinion, findings and conclusions of law. Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 295, 63 S.Ct. 1070, 87 L.Ed. 1407; Haskell v. Kansas Natural Gas Co., 224 U.S. 217, 223, 32 S.Ct. 442, 56 L.Ed. 738; Fagin v. Quinn, 5 Cir., 24 F.2d 42, 44, cert. den. 277 U.S. 606, 48 S.Ct. 602, 72 L.Ed. 1012; American Propeller & Mfg. Co. v. U. S., 300 U.S. 475, 479–489, 57 S.Ct. 521, 81 L.Ed. 751; City of Vicksburg v. Henson, 231 U.S. 259, 273, 34 S.Ct. 95, 58 L.Ed. 209. Judge Coleman's opinion refers to "advantages", 130 F. Supp. at 579, "profits" and "unjust enrichment", at 580. The language in the opinion might have justified a provision in the decree awarding plaintiffs "gains" and "advantages", as well as "profits", but the precise wording of the decree was debated at length, and I conclude that the word "profits" was used therein deliberately rather than the broader word "advantages".

The decree was affirmed on appeal, and both the Fourth Circuit and this court have refused to reopen it at the request of Colgate. It should not be reopened and rewritten at the request of plaintiffs.

Plaintiffs call attention to the fact that the decree also contained a requirement that Colgate assign to plaintiffs all its right, title and interest in certain patent applications. However, the decree did not provide that these patent applications be assigned to plaintiffs on the ground that they were part of Colgate's "profits"; their assignment was required by a separate provision of the decree. If the court had intended to allow recovery for good will, a separate provision to that effect should also have been included.

No case in which the court approved such an allowance for good will as is claimed by plaintiffs herein has been cited or found. Byerly v. Sun Co., E.D. Pa., 226 F. 759, summarily dismissed the possibility of an allowance for good will in an accounting for profits. In Stromberg Motor Devices Co. v. Detroit Trust Co., 7 Cir., 44 F.2d 958, at 964, the Court said: "The value of a good will is not easily ascertainable, but when demonstrably present may be considered in arriving at profits". However, the Court affirmed the action of the trial court in overruling exceptions to the Master's report which held, as the Master has found in the case at bar, that the value of the good will was not satisfactorily proved. In Century Distilling Co. v. Continental Distilling Co., 3 Cir., 205 F.2d 140, discussed above, in which differential accounting was approved, the Court stated that the Master's disallowance of any damages, loss or impairment of good will presented a question of fact on which the Master's determination did not constitute reversible error.

Moreover, the expert opinion evidence offered by plaintiffs to show the value of the good will or going concern value of Colgate's pressurized shaving cream business was not persuasive to the Master and is not persuasive to the court. The

ness". However, the examples used in the note show that the "advantage" referred to is limited to net or gross profits, as commonly understood, or something similar thereto, and does not embrace good will.

Master discussed that evidence at length in his report, and his findings are justified by his analysis. An additional weakness in plaintiffs' evidence, not discussed by the Master, should also be noted. The good will value of a business is usually computed on the assumption that the business is being sold to someone who will continue the business and that the seller will no longer compete. The going concern value of a business must include the assumption that the business will be allowed to continue to manufacture and sell the same products it had manufactured and sold before. After November 19, 1956, however, Colgate was not allowed to manufacture or sell any products which either infringed the patent or violated any trade secret.[21]

What Colgate really acquired by the momentum of good will which it built up for its adjudicated products in violation of plaintiffs' rights was an opportunity to begin marketing its altered products without going through three or four years of little or no profits, which would have been necessary to achieve a satisfactory volume of business if the altered products had started from scratch in July 1956. That advantage was of value to Colgate, but its value cannot be awarded to plaintiffs in this case for several reasons: (1) it was not a profit within the meaning of that word as used in the decree; (2) plaintiffs offered no satisfactory evidence of the value; (3) the Master gave weight to the momentum of good will in two recommendations which have been adopted by the court, namely, that plaintiffs be allowed to recover all and not part of Colgate's profits, and that more than $1,000,000 expended by Colgate for advertising in 1955–56 be disallowed as an expense in computing the profits made by Colgate in the sale of Rapid Shave No. 2 during those years; and (4) the court has also reduced for similar reasons the deduction claimed by Colgate for research and development expense during the years 1955–56.

The Master properly concluded that plaintiffs' claim for an allowance based upon the good will or going concern value of its business in the adjudicated products must be disallowed.

4.

*Profits on General Sales*

(Item IV of the Master's Recommendations)

Colgate's general sales of all adjudicated products embodying either the 12(a) trade secret or the 12(c) trade secret during the accounting period, together with the cost of sales and operating expenses, as computed by Colgate, are set out below in the first column, which shows an overall profit of $51,324 before any deduction for royalties. The second column sets out the cost of sales and op-

21. The Master found that the "real source" of the going concern value of Colgate's pressurized lather business after November 19, 1956, was the successful exploitation of a product embodying a non-protected hydrocarbon propellant, which, if it ever was a secret, was published to the world by plaintiffs in the Spitzer patent, which issued in 1953. At the very least, this was an important element of the going concern value. Colgate argues that the real source of its opportunity to start selling the altered product without having to go through a previous four years of build up was not its use of either the 12(a) or the 12(c) trade secret, but the fact that it had previously built up a business in Freon-propelled pressurized shaving cream. Colgate admits that by continuing, after October 13, 1953, to build up that business it infringed the plaintiffs' patent, but contends that by paying a reasonable patent royalty under 35 U.S.C.A. 284 and paragraph 9 of the decree, it will have made full statutory restitution for this act. It is true that the Freon propellants were an integral part of Rapid Shave No. 2, but so were the three superfatting agents which constituted the 12(c) secret. Colgate's argument that, in building up a business in Freon-propelled shaving cream and then shifting to a hydrocarbon-propelled product, it did no more than that which all of plaintiffs' licensees were free to do and which many of them did do, overlooks the fact that the use of the misappropriated trade secrets over the years played a substantial part in building up Colgate's business in pressurized shaving cream.

erating expenses which the Master found to be reasonable and proper. Using those figures the Master found Colgate's overall profit from the sale of products embodying the two trade secrets, with no allowance for Federal income tax and before deduction for reasonable royalties, to be $3,536,474. The review by this court has resulted in a slight modification of the Master's recommendations. The third column contains the figures as determined by the court; it shows the corresponding profit before royalties to be $3,525,944.

*General Sales—Overall Profits on Adjudicated Products*

| | Colgate's Figures | Master's Figures | Court's Figures |
|---|---|---|---|
| Net Sales to Customers. | $19,868,415 | $19,868,415 | $19,868,415 |
| Cost of Sales (The Court's reduction is in the "Overhead" component) | 8,757,081 | 8,364,473 | 8,364,473 |
| Gross Profit | $11,111,334 | $11,503,942 | $11,503,942 |
| Operating Expenses: | | | |
| Advertising | $ 6,513,651 | $ 5,401,595 | $ 5,504,266 |
| Selling | 815,530 | 407,765 | 407,765 |
| Freight | 626,866 | 626,866 | 626,866 |
| Warehousing & Shipping | 495,685 | 247,842 | 247,842 |
| Doubtful Accounts | 7,654 | 7,654 | 7,654 |
| Cash Discount Allowed | 362,332 | 362,332 | 362,332 |
| Administrative | 936,650 | 468,325 | 468,325 |
| Research & Development | 381,127 | 381,127 | 288,936 |
| Packaging | 20,202 | 20,202 | 20,202 |
| Market Research | 43,760 | 43,760 | 43,760 |
| Provision for Income Taxes | 856,553 | – | – |
| Total | $11,060,010 | $ 7,967,468 | $ 7,977,948 |
| Net Operating Profit before Royalties | $ 51,324 | $ 3,536,474 | $ 3,525,994 |

Since the adjustments made by the court to the Master's figures deal entirely with the period during which Rapid Shave No. 2 and Instant Barber Shave were being sold at a profit, the entire adjustment—a net reduction in operating profit of $10,480—will be reflected in the computation of net profits after royalty deductions on general sales of those products.

The Master's computations of net profits after reasonable royalties are set out in paragraphs 181 and 189 of his report. The court has made no change in the royalties recommended by the Master and used by him in those computations, so it will not be necessary to set out the court's recomputations. The $10,480 reduction made by the court in overall operating profits will simply re-

duce by $10,480 the Master's total figure for net profits after deduction of reasonable royalties on general sales for which Colgate is accountable to plaintiffs, i. e. will reduce that figure from $2,760,902 to $2,750,422.

### 5.

### Specialized Sales

(Item V of the Master's Recommendations)

We have been dealing heretofore with Colgate's general sales of pressurized shaving cream in the United States. The parties and the Master have treated as a separate group of items Colgate's "specialized sales", which include industrial sales, export sales from U. S. factories, shipments to foreign subsidiaries and branches, and freight claim sales. Colgate submitted sales figures and what purported to be actual profit and loss figures on these items showing a total profit (without deduction for income tax or royalties) of $39,648 on such sales, if loss periods are disregarded, divided as follows: $2,658.50 profit on sales of Rapid Shave No. 1, $32,519.50 profit on sales of Rapid Shave No. 2, and $4,470 profit on sales of Instant Barber Shave; but showing, if loss periods are not disregarded, profits of $516 on such sales of Rapid Shave No. 1 and $1,286 on such sales of Instant Barber Shave, with losses on Rapid Shave No. 2 and on the sales of unidentified Rapid Shave products in the year 1953.

The Master did not make any separate adjustments to Colgate's claimed expenses on specialized sales, but applied to the total specialized sales reported by Colgate the same rate of profit, 17.8%, which the Master found had been earned on general sales. Colgate contends that the Master was not justified in applying the 17.8% rate to the specialized sales, since there is no evidence with respect to the prices at which the goods were sold abroad, nor the expenses in connection therewith. This contention seems sound, since no evidence has been called to the court's attention which shows that the prices obtained, the cost of sales and other expenses, or the average profits per dollar of sales were the same for the specialized sales as for the general sales. Indeed, there is evidence to the contrary. The court must therefore consider the matter afresh.

The proper approach is to apply the principles of the Restatement, Torts, sec. 747, comment d,[22] and to accept Colgate's statement of its actual profits for each product each year, without offsetting the loss years, but to deduct from those profits the royalties recommended by the Master and allowed by the court. This conclusion is not inconsistent with

---

22. "*d. Selection of defendant's profitable transactions.* If the defendant's tortious conduct occurred in independent transactions, he may be required to account for his profits on those transactions which resulted in profit, without deduction of losses suffered in the other transactions. For example, the defendant makes one hundred sales of goods which bear a designation infringing the plaintiff's trade-mark. On forty of the sales he makes a profit; on the remaining sixty he suffers a loss. If all the sales were independent of each other, the defendant is subject to an accounting of his profits on the forty sales without reference to his losses on the sixty. Each of the sales is a wrong to the plaintiff and each stands by itself. A sale resulting in a loss may not be offset by an infringer against another and independent sale resulting in a gain for the purpose of extinguishing or reducing a liability for profits. If, however, the unprofitable sale is a necessary preliminary step without which the profitable sale could not be effected, both sales must be included in the computation. Thus, in order to make a large sale to a customer at a profitable price, the defendant may find it necessary to make a preliminary sale to him at an unprofitable price. Or to introduce his product to the market, the defendant may make some sales, in the nature of advertising, at a nominal price. In such cases the defendant is liable only for the net profits resulting from both the final and the preliminary sales. Compare § 748, Comment *b*." This paragraph is supported by Duplate Corp. v. Triplex Safety Glass Co., 298 U.S. 448, 56 S.Ct. 792, 80 L.Ed. 1274, and Adolph Gottscho, Inc. v. American Marking Corp., 26 N.J. 229, 139 A.2d 281, 67 A.L.R.2d 816.

the conclusions reached with respect to general sales, because with respect to specialized sales no adjustment is being made to the actual figures submitted by Colgate such as was made by the Master to the expenses claimed by Colgate in connection with the general sales.

Since the royalty rates for foreign and domestic sales are different, because of the lack of patent royalty on foreign sales, the computations of profits after royalties are broken down into separate sections.[23]

Against the profit of $2,658.50 on sales of Rapid Shave No. 1 must be charged a 10% royalty on such sales, amounting to $646.15, leaving an allowable profit of $2,002.35.

Against the profit of $6,867.50 on U. S. sales of Rapid Shave No. 2 must be charged a 6% royalty on such sales, amounting to $877.71, leaving an allowable profit of $5,989.79.

Against the profit of $25,652 on foreign sales of Rapid Shave No. 2 must be charged a 1% royalty on such sales, amounting to $2,580.54, leaving an allowable profit of $23,071.46.

Against the profit of $1,965 on U. S. sales of Instant Barber Shave must be charged a 6% royalty on such sales, amounting to $299.04, leaving an allowable profit of $1,665.96.

Against the profit of $2,505 on foreign sales of Instant Barber Shave must be charged a 1% royalty on such sales, amounting to $72.40, leaving an allowable profit of $2,432.60.

The total allowance for profits on specialized sales is, therefore, $35,162.

## C.

### INCREASED DAMAGES FOR PATENT INFRINGEMENT

(Items VII and VIII of the Master's Recommendations)

VII. The Master allowed total damages for patent infringement in the amount of $814,685, based upon a royalty of 5% on infringing sales.

By the order entered pursuant to the opinion in the contempt proceeding, 164 F.Supp. 503, aff'd 4 Cir., 269 F.2d 299, this court ordered that the damages with respect to 1,600,000 cans of the adjudicated products sold by wholesalers and retailers after November 20, 1956, should be trebled. The total award of damages for patent infringement ($814,-685), based upon the 5% royalty, includes $41,400 for those cans. Additional damages of $82,800 are required to treble this amount, and will be included in the award.

VIII. There remains a balance of $773,285 ($814,685 less $41,400) of damages for patent infringement. Paragraph 9 of the decree reserved for future determination whether those damages should be increased, and directed the Master to make a recommendation with respect thereto.

Increased damages under the statute, 35 U.S.C.A. § 284, may be (a) compensatory or (b) exemplary or both.

■ (a) Where a plaintiff in a patent suit has suffered damages but the precise amount is not provable by satisfactory evidence, a compensatory increase may be allowed. But where damages have been awarded on the basis of a reasonable royalty, as in this case, additional compensatory damages may not be awarded for the same character of damages as have already been considered in fixing the reasonable royalty. Cf. Union Carbide Corp. v. Graver Tank & Mfg. Co., 7 Cir., 282 F.2d 653, 675; Beacon Folding Machine Co. v. Rotary Machine Co., D.Mass., 17 F.2d 934; Activated Sludge, Inc. v. Sanitary District of Chicago, N.D.Ill., 64 F.Supp. 25. The Master properly found no basis for additional compensatory damages.

■ (b) Where, however, the patent infringement is conscious and deliberate,

---

23. The records do not break down the 1953 sales of Palmolive Rapid Shave between Rapid Shave No. 1 and Rapid Shave No. 2. Since the latter product was introduced about the middle of the year, the court has treated the 1953 sales as being one-half Rapid Shave No. 1 and one-half Rapid Shave No. 2.

an exemplary increase may be made in the discretion of the court. The Master carefully reviewed all of the relevant facts and conclusions contained in the several opinions filed herein by this court or by the Court of Appeals. He also considered the arguments advanced by plaintiffs why the damages should be trebled and the arguments advanced by Colgate why no additional damages should be allowed. See paragraphs 226 to 235 of the report. He recommended an award of exemplary damages against Colgate in the amount of 100% of the infringement damages awarded, except the $41,400 thereof which had already been trebled as directed by the former decision. This recommendation adds $773,285 to the award.

The facts and arguments set out in the Master's report need not be repeated here. There is no doubt in my mind that some exemplary damages must be awarded. The only serious question is whether they should be doubled or trebled. On the one hand, Colgate's repeated wrongful acts warrant the severest condemnation. Many of those wrongful acts, however, involved the misappropriation of trade secrets, with which we are not concerned in considering the question of exemplary damages for patent infringement. Since the total award to be made herein will deprive Colgate of all its profits, without credit for income taxes paid, and will impose on Colgate the obligation to pay very substantial attorneys' fees, as well as treble damages for the grossest infringement, the court concludes that it should adopt the recommendation of the Master that doubling the remainder of the infringement damages, $773,285, is an adequate and sufficient penalty and deterrent.

*

Items VII and VIII, as recommended by the Master, are approved.

24. The term "Attorneys' Fees", as used in the opinion, includes disbursements made by the attorneys. Plaintiffs presented to the Master a claim for certain other expenses relating to the case, such as amounts paid to its accountants and

## D.

## ATTORNEYS' FEES [24]

(Including the Attorneys' Fees Embraced in Item VI of the Master's Recommendations)

Plaintiffs' claim for attorneys' fees may be broken down into (1) those incurred for services rendered prior to May 15, 1955, the date of the original decree and (2) those incurred for services rendered after that date. Each group includes services in connection with patent issues and services in connection with trade secret issues.

(1) The decree of May 18, 1955, contained the following paragraph: "16. That the plaintiffs have and recover their costs and taxable disbursements to date from the defendants, the respective amounts to be paid by each of the defendants to be determined by the Court upon entry of a final decree herein; and, further, the Court having found from the evidence that the misconduct of defendant Colgate-Palmolive Company with respect to its wrongful appropriation of plaintiffs' trade secrets and infringements of plaintiffs' patent renders this an exceptional case within the meaning of 35 U.S.C.A. § 285, that the plaintiffs have and recover from the defendant Colgate-Palmolive Company reasonable attorneys' fees incurred by said plaintiffs in this litigation to date, the amount thereof to be recommended by the Special Master appointed herein; and that this Court retain jurisdiction for the purpose of determining whether or not any further award of attorneys' fees as may be incurred by the plaintiffs in further proceedings in this case should be allowed."

This provision of the decree was affirmed on appeal. Judge Parker said that this "is a case of deliberate and wilful infringement based upon and made possible by appropriation of trade secrets upon the basis of which Colgate

to Snell. The Master properly concluded that such additional expenses are not recoverable as compensable damages in this case, and plaintiffs have not argued to the court that the Master's conclusion was improper.

has itself attempted to obtain a patent" and that "the circumstances were certainly sufficient to make this an 'exceptional' case within the meaning of the statute, the purpose of which was to give the court power to throw the burden of unnecessary and vexatious litigation on the shoulders of those who are responsible for it." 230 F.2d at 866.

Pursuant to paragraph 16 of the decree and a stipulation of the parties the Master found that plaintiffs had paid their attorneys for services rendered prior to May 18, 1955, a total of $192,631, and recommended the allowance of that amount.[25] Colgate does not dispute that recommendation.

(2) With respect to the fees and disbursements after May 18, 1955, the Master concluded that he was "not authorized under the Decree to consider Carter's claim for additional attorneys' fees, which, under the Decree, are reserved for Court consideration."

Colgate disputes, on both legal and factual grounds, the propriety of any award for services rendered after May 18, 1955, in connection with the trade secret issues. Colgate further contends that by imposing on it the burden of the contempt trial and an unnecessarily costly accounting, plaintiffs have deprived themselves of the right to an award of any post-decree attorneys' fees; and that even if some award is proper it should be restricted to all or part of those fees which are attributable to the patent issues.

The award of fees with respect to the patent issues is controlled by 35 U.S.C.A. § 285, which states simply: "The Court in exceptional cases may award reasonable attorney fees to the prevailing party." Both this court and the Fourth Circuit have recognized that this is an exceptional case within the meaning of that statute.

There is no similar statute with respect to the trade secret issues. Any such award must be based upon the inherent power of a federal court to award attorneys' fees as costs in certain types of cases. The general field has been recently explored by the Fourth Circuit in Local No. 149 International Union, etc. v. American Brake Shoe Co., etc., 298 F.2d 212. The careful opinion in that case quoted basic principles from Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184, Specialty Equipment & Machinery Corp. v. Zell Motor Car Co., 4 Cir., 193 F.2d 515, and Rolax v. Atlantic Coast Line R. Co., 4 Cir., 186 F.2d 473. In the Rolax case Judge Parker said: "Ordinarily, of course, attorneys' fees, except as fixed by statute, should not be taxed as a part of the costs recovered by the prevailing party; but in a suit in equity where the taxation of such costs is essential to the doing of justice, they may be allowed in exceptional cases." The opinion in Local No. 149 noted that unnecessary, groundless, vexatious and oppressive petitions and motions have been held to constitute appropriate reason for the exercise of the equitable power to award attorneys' fees against the offending party, and said: "In actions for unfair competition attorneys' fees are assessed as an element of damages where the wrongdoers' action is unconscionable, fraudulent, willful, in bad faith, vexatious or exceptional." 298 F.2d at 215. The many cases cited in the Local No. 149 opinion show that these principles have been applied in various types of cases.

This court reaffirms its finding and conclusion that the misappropriation of plaintiffs' trade secrets by Colgate was unconscionable, willful, and in bad faith, the equivalent of fraud. Reynolds v. Whitin Machine Works, 4 Cir., 167 F.2d 78, at 87. Plaintiffs are, therefore, entitled to an allowance for reasonable attorneys' fees and disbursements incurred in connection with the trade secret issues as well as the patent issues. This does not mean that plaintiffs are en-

---

25. During the hearing on the wording of the decree, Judge Coleman noted that the issues in the trial before him were so interrelated that "you cannot say that any of the services prior to May 1955 did not relate to the patent".

titled to recover all of their attorneys' fees and disbursements; the award must recognize any countervailing equities of Colgate, such as the time spent by its attorneys on any unreasonable claims made by plaintiffs. Sprague v. Ticonic National Bank, supra; Swan Carburetor Co. v. Chrysler Corp., E.D.Mich., 55 F. Supp. 794, 797, modified on other grounds, 6 Cir., 149 F.2d 476; Victory Fireworks & Specialty Co. v. Commercial Novelty Co., D.Md., 26 F.Supp. 126, 130. See also Union Carbide Corp. v. Graver Tank & Mfg. Co., 7 Cir., 282 F.2d 653, cert. den. 365 U.S. 812, 81 S.Ct. 692, 5 L.Ed.2d 691.

Aside from (A)—their claim of $192,-631 for services and disbursements before May 18, 1955—plaintiffs have divided their claims for attorneys' fees and disbursements into seven parts, as follows:

(B) Colgate's appeal from the decree of May 18, 1955, to the affirmance of March 8, 1956, 230 F.2d 855, and the denial of the petition for rehearing, April 9, 1956—$48,933.09.

(C) Colgate's petition for certiorari and petition for rehearing on denial thereof, June 1956 to November 13, 1956 (352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59 and 352 U.S. 913, 77 S.Ct. 152, 1 L.Ed.2d 120)—$5,319.09.

(D) Colgate's motions to "clarify" and "amplify" the decree of May 18, 1955. Period—between December 1956 and May 9, 1957 (151 F.Supp. 427 and 243 F.2d 163)—$9,522.30.

(E) Colgate's petition for rehearing and petition for certiorari (243 F.2d 163; denied 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed. 2d 38)—$2,087.04.

(F) The accounting proceedings before the Special Master—from the beginning of work on the accounting in April 1956 until the eve of trial, September 1960—$167,860.27.

(G) The accounting proceedings from September 1960 to the Master's report, April 3, 1962—$300,892.09.

(H) The accounting proceedings in the District Court to August 31, 1962—$72,667.20.

Colgate admits that these services were rendered at the times and for the purposes stated above and that the amounts of the fees and expenses are reasonable.

Plaintiffs concede that they are not entitled to recover their attorneys' fees incurred in their effort to hold Colgate in contempt for selling the altered products. Nor is Colgate entitled to recover from plaintiffs its attorneys' fees and expenses incurred in defending against that claim. But, the great expense to which Colgate was put in defending against that unsuccessful claim is an equity to be considered in determining whether plaintiffs should recover *all* of their other attorneys' fees from Colgate.

As we have seen, whether the services dealt with patent issues or with trade secret issues or with both, the court may make an allowance in this case;[26] and any such allowance may be reduced for equitable reasons.

With respect to Items B, C, D and E, reasons similar to those which called for a full allowance for services rendered before May 18, 1955 (Item A), call for a full allowance of reasonable fees for

---

26. Counsel for plaintiffs have attempted to split the charges covered by Items B and C between patent issues and trade secret issues, apportioning $37,593.14 and $3,999.09 respectively to patent issues and $11,349.95 and $1,320.00 to trade secret issues. Much of the work dealt with both issues. The services covered by Item D dealt with trade secret issues alone, while those covered by Item E dealt only with the patent issues. With respect to Items F, G and H, plaintiffs' counsel were unable to make a break-down, and estimated that two-thirds of the services were rendered on the patent issues, one-third on the trade secret issues. This estimate appears arbitrary and contrary to the facts as they appear in the record, which show that the time devoted to the patent issues in connection with the accounting was probably less than half. But, as we have seen, that is not the controlling point. Much more important are the countervailing equities raised by Colgate.

all services included in those items. They total $65,861.52.

▆▆▆ With respect to Items F, G and H countervailing equities include the unnecessary expense placed on Colgate during the accounting as a result of plaintiffs' shifting theories, and the elaborate discovery and preparation required to meet plaintiffs' efforts to recover a constantly increasing claim for good will, which has been rejected both by the Master and the court. All factors considered, the court finds that plaintiffs are entitled to recover from Colgate fifty percent (50%) of their reasonable attorneys' fees and disbursements for the services included in Items F, G and H. These items total $541,419.56, fifty percent (50%) of which is $270,709.78.

## E.
## THE COURT'S AWARDS

| | | |
|---|---|---|
| I. | Infringement Damages | $ 814,685.00 |
| II. | Misappropriation Damages under Paragraph 12 (a) of the Decree | 271,718.00 |
| III. | Misappropriation Damages under Paragraph 12 (c) of the Decree | 184,155.00 |
| IV. | Profits on General Sales | 2,750,422.00 |
| V. | Profits on Specialized Sales | 35,162.00 |
| VI. | (a) Attorneys' Fees to May 18, 1955 | 192,631.00 |
| VI. | (b) Attorneys' Fees after May 18, 1955 | 336,571.30 |
| VII. | To Treble Damages on 1.6 million Cans | 82,800.00 |
| VIII. | Exemplary Damages | 773,285.00 |
| IX. | Interest (see below) | |
| X. | Costs (see below) | |

## F.
## INTEREST

The several awards are governed by different rules with respect to interest.

▆▆ ▆▆ I, II, III.—*Infringement Damages and Misappropriation Damages based upon Reasonable Royalties.* In Swan Carburetor Co. v. Nash Motors Co., 4 Cir., 133 F.2d 562, 567, Judge Soper, speaking for the Court, said: "Under the general rule, interest on damages ascertained on the basis of an established royalty runs from the time when the royalty should have been paid, while interest on damages calculated on the basis of a reasonable royalty does not begin to run, in the absence of special circumstances, until the amount of the damages has been judicially ascertained and liquidated. Tilghman v. Proctor, 125 U.S. 136, 143, 8 S.Ct. 894, 31 L.Ed. 664; Duplate Corp. v. Triplex Safety Glass Co., 298 U.S. 448, 56 S.Ct. 792, 80 L.Ed. 1274; Locomotive Safety Truck Co. v. Pennsylvania R. Co., C.C., 2 F. 677; Munising Paper Co. v. American Sulphite Pulp Co., 6 Cir., 228 F. 700; Merrell Soule Co. v. Powdered Milk Co., 2 Cir., 7 F.2d 297; Richmond Screw Anchor Co. v. United States, 67 Ct.Cl. 63." This is still the rule. Union Carbide Corp. v. Graver Tank & Mfg. Co., 7 Cir., 282 F. 2d 653, 676–677, cert. den. 365 U.S. 812, 81 S.Ct. 692, 5 L.Ed.2d 691. Cf. Chesapeake & O. Ry. Co. v. Kaltenbach, 4 Cir., 124 F.2d 375. Special circumstances are present in this case which justify and require an award of interest—as to Item I from July 1, 1956, as to Item II from July 1, 1953, and as to Item III from July 1, 1956. These special circumstances are substantially the same as those which render this an exceptional case within the meaning of 35 U.S.C.A. § 285, and which justify an award of

attorneys' fees for the misappropriation of trade secrets. See D(2) above.

For reasons stated in Hartford National Bank & Trust Co. v. E. F. Drew & Co., D.Del., 188 F.Supp. 347, 349, aff'd 3 Cir., 290 F.2d 589, cert. den. 368 U.S. 825, 82 S.Ct. 45, 7 L.Ed.2d 29, and the many cases cited therein, the rate of interest should be four percent (4%) per annum to the date of judgment herein. Simple, not compound, interest will be allowed. Interest on the entire judgment will run at the rate of six percent (6%) per annum.

■ IV.—*Profits on General Sales.* —These profits have been allowed because of trade secret misappropriation. Most of the cases cited by the parties are patent cases under the old law when profits were recoverable for infringement. The rule developed in that line of cases, and applied in trademark and other analogous lines, is that in the absence of special circumstances an award of profits does not bear interest until the amount is liquidated; where the matter has been referred to a Master, interest is usually allowed from the date of the filing of the Master's report.. Mowry v. Whitney, 14 Wall. 620, 81 U.S. 620, 20 L.Ed. 860; Tilghman v. Proctor, 125 U.S. 136, 8 S.Ct. 894, 31 L.Ed. 664; Gotham Silk Hosiery Co. v. Artcraft Silk Hosiery Mills, Inc., 3 Cir., 147 F.2d 209; Century Distilling Co. v. Continental Distilling Corp., 3 Cir., 205 F.2d 140, cert. den. 346 U.S. 900, 74 S.Ct. 226, 98 L.Ed. 400; Western Glass Co. v. Schmertz Wire Glass Co., 7 Cir., 226 F. 730; L. P. Larson, Jr., Co. v. William Wrigley, Jr., Co., 7 Cir., 20 F.2d 830. Cf. the early case of Burdett v. Estey, 2 Cir., 3 F. 566. See also Sutton v. Gulf Smokeless Coal Co., 4 Cir., 77 F.2d 439.

Any possible allowance of interest from an earlier date must be based upon equitable considerations. Oehring v. Fox Typewriter Co., 2 Cir., 251 F. 584, 588. Cf. L. P. Larson, Jr., Co. v. William Wrigley, Jr., Co., supra. In Mathey v. United Shoe Machinery Corp., D.Mass., 54 F.Supp. 694, 700–701, cited by plaintiffs, the profits on which interest was allowed were plaintiff's lost profits, not defendant's profits. And in the leading New York case cited by plaintiffs the amount of profits was capable of ascertainment by defendant at the time of the sale. Cutter v. Gudebrod Bros. Co., 190 N.Y. 252, 83 N.E. 16, 17. That is not true in the case at bar.

■ Since Colgate was unable to prove—because it was impossible for it to keep its books to show—the amount of the profits attributable to the misappropriation of the trade secrets, plaintiffs have been allowed to recover *all* of Colgate's profits from the sale of the adjudicated products. See B. 1. above. Such an award of a larger amount than plaintiffs would have been entitled to recover if it had been possible for Colgate to keep its books to show what the portion of the profits was attributable to the trade secrets is a factor to be considered in determining whether Colgate will be unjustly enriched if it is not required to pay interest on the total profits so awarded. See Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 106 F.2d 45, aff'd 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825.

Moreover, Colgate's statement of the amount of such profits, prepared from its books, has been modified by the Master and by the court to reduce the deductions claimed by Colgate for overhead, advertising, selling, warehousing, shipping, administrative expenses and for income taxes. See B. 2. above. The court has also reduced the deduction for research and development expense. The reasons for these adjustments justify an award of profits in the amount of $2,750,422, which has been made, but the size of the award, compared to the amount of the royalties, is a factor to be considered on the question of interest.

■ Colgate's wilful and repeated misappropriations of trade secrets might be considered special circumstances justifying an allowance of interest on profits were it not for the countervailing equities, discussed in the two paragraphs immediately preceding. All factors con-

sidered, the court concludes that in this respect the case is like L. P. Larson, Jr., Co. v. William Wrigley, Jr., Co., supra, where the Seventh Circuit said: " * * * the usual practice of computing interest in an accounting from the date of the master's report, prevails, unless, as indicated in the cases cited, circumstances require an earlier beginning date. The award here in issue is so palpably and unquestionably ample to fully compensate Larson for any and all invasion of its rights, as to suggest no circumstances which invoke the court's discretion to enlarge it by allowance of interest back of the date of the master's report, * *." 20 F.2d at 836.

Interest at four percent (4%) per annum will therefore be allowed on Item IV from April 3, 1962, to the date of judgment herein.

V. *Profits on Specialized Sales.*— This is a small item, as to which the court has greatly reduced the Master's allowance. No interest before judgment should be allowed thereon.

 VI (a). *Attorneys' Fees to May 18, 1955.*—Paragraph 16 of the decree, entered herein on May 18, 1955, found the case exceptional, within the meaning of 35 U.S.C.A. § 285, held that plaintiffs are entitled to receive reasonable attorneys' fees to the date of the decree, as well as their costs and taxable disbursements, and directed the Master to recommend the amount of such fees. On October 24, 1960, during the proceedings before the Master, the parties stipulated that the attorneys' fees and expenses to which plaintiffs are entitled under that paragraph amount to $192,-631. Plaintiffs have not shown the dates on which those payments were made.

Colgate contends that attorneys' fees are not part of the recovery base upon which an allowance of interest may be made, but that they are similar to costs. It cites former sec. 70 of Title 35, U.S.C., 1946 ed., Act of Aug. 1, 1946, c. 726, 60 Stat. 778, which provided in part: "The

court may in its discretion award reasonable attorney's fees to the prevailing party upon the entry of judgment on any patent case." The present sec. 285, which is part of the 1952 recodification of the Patent Act, makes no reference to the entry of judgment or to any other point of time.[27] The allowance of attorneys' fees is analogous to the allowance of taxable costs and disbursements, some of which are ordinarily made long before the judgment or decree, yet do not carry interest. No authority for the allowance of interest before judgment on this item has been cited, and no such interest will be allowed.

VI (b). *Attorneys' Fees after May 18, 1955.*—For the reasons set out in VI (a) above, and also because the amount of such fees to be awarded to plaintiffs has been determined for the first time in this opinion, no allowance of interest before judgment on this item will be made.

VII, VIII.—*Exemplary Damages.*—No interest before judgment should be allowed on these items.

## G.

## COSTS

Taxable costs in this court, except the Master's fee and expenses, should be paid by Colgate. The Master's fee should be paid sixty percent (60%) by Colgate, forty percent (40%) by plaintiffs.

*

Counsel will prepare an appropriate judgment order.

## SUPPLEMENTARY OPINION.

Colgate has moved for a rehearing on the one issue whether plaintiffs should be allowed to recover all of Colgate's profits from the sale of Rapid Shave No. 2 and Instant Barber Shave by reason of Colgate's use therein of the 12c secret, or whether there should be an apportionment of those profits. Colgate's counsel appear to find some ambiguity in the reasons for the Court's ruling that plaintiffs

27. It provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party."

are entitled to recover all the profits; so, in order that there may be no further misunderstanding, the Court will restate those reasons briefly and consider again the teaching of Reynolds v. Whitin Machine Works, 4 Cir., 167 F.2d 78, and Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 106 F.2d 45, aff'd 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825.

The 12(c) secret was described in the decree as follows: "(e) By combining in a pressurized lather-generating composition a soap solution superfatted with petrolatum, carbowax and excess stearic acid, and embodying said secret combination in its products 'Rapid Shave No. 2' and 'Instant Barber Shave'."

Both the Master and the Court found that the combination of the three so-called superfatting agents with the soap solution gave to the resulting pressurized lather-generating composition a smooth oiliness or emollient feeling similar to the effect produced by brushless shaving creams, a characteristic which Colgate's earlier products did not have, but which Colgate desired that Rapid Shave No. 2 should have, and which Colgate elected to give it by use of the 12(c) secret. To achieve the "brushless effect" without destroying other necessary or valuable characteristics of the pressurized products, it was necessary for Colgate to consider the stability, viscosity, lubricity and texture of the lather, as well as its soothing or emollient effect on the skin. Each of the three superfatting agents included in the 12(c) secret helped to provide one or more of the desirable characteristics, or to offset the deleterious effect of another ingredient. The functions of the several superfatting agents were studied by Fine at Snell's; and both this Court and the Fourth Circuit long ago held that their combined use by Colgate was a misappropriation of plaintiffs' 12(c) secret.

Because the 12(c) secret ingredients became integral parts of unitary products contributing substantially to their commercial success, it is impossible to determine precisely what part of Colgate's profits from the sale of Rapid Shave No. 2 and Instant Barber Shave was attributable to the use of the 12(c) secret; in other words, it is impossible to make an accurate apportionment. It is also impossible to make a reasonably accurate apportionment.

Colgate *now* asks leave to present expert testimony in an attempt to show what percentage of the profits should be attributed to the 12(c) secret. No doubt some "expert" could be found who would undertake to make such an apportionment, but Colgate's request must be denied: (1) because this Court believes it to be inherently impossible for any witness to make a reliable apportionment; and (2) because Colgate elected, before the Master and before the Court, to try to avoid or minimize any award of profits by arguing failure of proof on the part of plaintiffs, and now seeks to engage in a battle of experts because its original strategy was unsuccessful.

There remains to be considered Colgate's argument, based on Sheldon and Reynolds, that it is unfair to Colgate not to make some apportionment. In Sheldon the Second Circuit said: "[W]e are resolved to avoid the one certainly unjust course of giving the plaintiffs everything, because the defendants cannot with certainty compute their own share. In cases where plaintiffs fail to prove their damages exactly, we often make the best estimate we can, even though it is really no more than a guess (Pieczonka v. Pullman Co., 2 Cir., 102 F.2d 432, 434), and under the guise of resolving all doubts against the defendants we will not deny the one fact that stands undoubted." 106 F.2d at 51. As Colgate notes, the Supreme Court said: "Petitioners stress the point that respondents have been found guilty of deliberate plagiarism, but we perceive no ground for saying that in awarding profits to the copyright proprietor as a means of compensation, the court may make an award of profits which have been shown not to be due to the infringement. That would be not to do equity but to inflict an unauthorized penalty."

309 U.S. at 405, 60 S.Ct. at 686. But the Supreme Court continued: "To call the infringer a trustee ex maleficio merely indicates 'a mode of approach and an imperfect analogy by which the wrongdoer will be made to hand over the proceeds of his wrong.' Larson Co. v. Wrigley Co., 277 U.S. 97, 99, 100, [48 S.Ct. 449, 72 L.Ed. 800]. He is in the position of one who has confused his own gains with those which belong to another. Westinghouse Co. v. Wagner Co., supra [225 U.S.] p. 618, [32 S.Ct. 691, 56 L.Ed. 1222]. He 'must yield the gains begotten of his wrong.' Duplate Corp. v. Triplex Co., 298 U.S. 448, 457, [56 S.Ct. 792, 80 L.Ed. 1274]. Where there is a commingling of gains, he must abide the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him." 309 U.S. at 405, 406, 60 S.Ct. at 686, 687. Because, in the case at bar, a reasonably accurate apportionment cannot be made, Sheldon is no authority for reducing the award.

Moreover, Sheldon was a plagiarism case. In Reynolds, a case dealing with trade secrets, the Fourth Circuit quoted with approval 4 Restatement, Torts, Sec. 757, Comment a (1939): "There is considerable discussion in judicial opinions as to the basis of liability for the disclosure or use of another's trade secrets. Analogy is sometimes found in the law of 'literary property,' copyright, patents, trademarks and unfair competition. The suggestion that one has a right to exclude others from the use of his trade secret because he has a right of property in the idea has been frequently advanced and rejected. The theory that has prevailed is that the protection is afforded only by a general duty of good faith and that the liability rests upon breach of this duty; that is, breach of contract, abuse of confidence or impropriety in the method of ascertaining the secret." 167 F.2d at 88. This passage is quoted in Colgate's brief, but together with the rest of the opinion in Reynolds and the opinion of the Supreme Court in Sheldon, it supports the refusal of this Court to

make an *arbitrary* apportionment, when a *reasonably accurate* apportionment cannot be made. This Court adheres to its decision, which is based on legal as well as equitable considerations.

The motion for rehearing is hereby denied.